# ATTACHMENT 1

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| KIM WATERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2018 CA 007054 B |
| v. | ) | |
| | ) | Judge Neal E. Kravitz |
| DISTRICT OF COLUMBIA, *et al.* | ) | Next Event:    Initial Conference |
| | ) | January 4, 2019, at 9:00 a.m. |
| Defendants. | ) | |
| | ) | |

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE THAT a Notice of Removal of this action was filed in the

United States District Court for the District of Columbia on November 16, 2018, pursuant to 28

U.S.C. §§ 1441 and 1446.  Therefore, this Court "shall proceed no further unless and until the case

is remanded" back to this Court by the United States District Court for the District of Columbia.

*See* 28 U.S.C. § 1446(d).  A copy of the Notice of Removal is attached.

**Dated: November 16, 2018**          Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

*/s/ Sarah Knapp*
SARAH L. KNAPP [470008]
Chief, Civil Litigation Division Section III

*/s/ Charles J. Coughlin*
CHARLES J. COUGHLIN [1016993]
Assistant Attorney General
Suite 630 South
441 Fourth Street, N.W.
Washington, D.C. 20001
Tel.: (202) 724-6608; (202) 727-6295
Fax: (202) 730-1887
Email: charles.coughlin@dc.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of November, 2018, the foregoing Notice of Removal

was served electronically or otherwise, to:

Jeanett P. Henry, Esq.
8403 Colesville Road, Suite 1100
Silver Spring, MD 20910
*Counsel for Plaintiff*

*/s/ Charles J. Coughlin*
CHARLES J. COUGHLIN
Assistant Attorney General

*10-29-18*
*8v  11:35*
*mayor copy*



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
Civil Actions Branch
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Kim Waters
_____
                                    Plaintiff

vs.                                                    Case Number   **2018 CA 007054 B**

District of Columbia
_____
                                    Defendant

**SUMMONS**

To the above named Defendant: *Serve Mayor Muriel Bowser*

    You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

    You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Jeanett P. Henry
_____
Name of Plaintiff's Attorney

8403 Colesville Road, Suite 1100
_____
Address
Silver Spring, MD 20910

(301) 562-1340
_____
Telephone

*Clerk of the Court*

By _____
                                    Deputy Clerk

Date   **10/09/2018**

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주세요     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                    Super. Ct. Civ. R. 4





### TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA
#### DIVISIÓN CIVIL
**Sección de Acciones Civiles**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

_____

_____  **Demandante**

contra

**Número de Caso:** _____

_____

_____  **Demandado**

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

*SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

Por: _____

_____
Dirección

Subsecretario

Fecha _____

_____
Teléfono

如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

말씀하시려면 전화번호 (202) 879-4828 로 연락하십시오         የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

**IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO_.**

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]

Super. Ct. Civ. R. 4



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Telephone: (202) 879-1133 • Website: www.dccourts.gov**

KIM WATERS
    Vs.                                     C.A. No.      2018 CA 007054 B
DISTRICT OF COLUMBIA et al

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the summons, the complaint, and this Initial Order and Addendum. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in Super. Ct. Civ. R. 4(m).

(3) Within 21 days of service as described above, except as otherwise noted in Super. Ct. Civ. R. 12, each defendant must respond to the complaint by filing an answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in Super. Ct. Civ. R. 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an initial scheduling and settlement conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than seven business days before the scheduling conference date.
No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

                                     Chief Judge Robert E. Morin

Case Assigned to: Judge NEAL E KRAVITZ
Date:  October 9, 2018
Initial Conference: 9:00 am, Friday, January 04, 2019
Location:  Courtroom 100
          500 Indiana Avenue N.W.
          WASHINGTON, DC 20001

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Actions Branch. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief   Judge   Robert   E.   Morin

Filed
D.C. Superior Court
10/03/2018 08:59PM
Clerk of the Court

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

| | |
|---|---|
| **Kim Waters,** : | |
| 515 Bolin Terrace | |
| Upper Marlboro, MD 20774 : | |
| | |
| Plaintiff, : | |
| | |
| v. : | Civil Action No. <u>2018 CA 007054 B</u> |
| | |
| **District of Columbia** : | |
| Serve:  Muriel Bowser, Mayor | |
| 1350 Pennsylvania Avenue, NW : | |
| Washington, DC 20001 | |
| : | |
| Serve:  Karl A. Racine, Esquire | |
| Attorney General for DC : | |
| 441 4th Street, NW | |
| Washington, DC 20001 : | |
| | |
| and : | |
| | |
| **Willie Fullilove,** : | |
| c/o Department of Youth Rehab. Servs. | |
| 450 H Street, NW : | |
| Washington, DC 20001 | |
| | |
| and : | |
| | |
| **Linda Harllee-Harper,** : | |
| c/o Department of Youth Rehab. Servs. | |
| 450 H Street, NW : | |
| Washington, DC 20001 | |
| | |
| Defendants. : | |

---

## COMPLAINT
### (Employment Discrimination)

### Introduction

1.   Plaintiff, Kim Waters, brings suit for damages she sustained in violation of the

-2-

District of Columbia Human Rights Act ("DCHRA"), D.C. Code, §§2-1401 through 2-1403 and

42 U.S.C. §1983. Specifically, Kim Waters contends that her employers subjected her to a

sexually harassing working environment based on her gender and retaliated against her for

complaining about the sexual harassment.

## Jurisdiction & Venue

2.    This Court has jurisdiction over this cause of action pursuant to D.C. Code

§ 2-1403.16, as the plaintiff alleges violations of the D.C. Human Rights Act, and pursuant to

D.C. Code § 11-921, as the amount in controversy exceeds ten thousand dollars ($10,000.00).

3.  Venue is proper in this Court because a substantial part of the acts and omissions

that give rise to this Complaint occurred within the District of Columbia.  Venue is further

proper because Defendants have offices in the District of Columbia.

4.  On or about February 2, 2017 Waters filed a complaint of sexual harassment and

retaliation with the D.C. Office of Human Rights.  On or about May 22, 2018 she obtained an

administrative dismissal of such claims.

## Parties

5.    Plaintiff, Kim Waters ("Waters"), a female resident of Maryland, has been

employed at the Department of Youth Rehabilitation Services ("DYRS") since 2005.

6.    Defendant, District of Columbia (the "District" or "DC"), a municipal

corporation, functions through various agencies, including DYRS, which is responsible for the

supervision, custody, and care of adolescents charged with delinquent acts in the District of

-3-

Columbia.  As the employer of the individual defendants, the District is liable for their actions

under the doctrine of *respondeat superior.*

7.      Defendant, Willie Fullilove ("Fullilove"), has been the Deputy Director of

Secured Programs at DYRS.   At all times relevant herein, he acted within the scope of his

employment with defendant District of Columbia.  He is being sued in his individual capacity.

Fullilove is an "employer" within the meaning of the DCHRA because he committed and/or

aided and abetted the unlawful acts to which Waters was subjected.

8.      Defendant, Linda Harllee-Harper ("Harllee-Harper"), has been the Senior Deputy

Director of DYRS and Fullilove's immediate supervisor.  Upon information and belief, Harllee-

Harper is charged with the day-to-day operations of the agency and reports to the agency

director.  At all times relevant herein, she acted within the scope of her employment with

defendant District of Columbia.  She is being sued in her individual capacity.  Harllee-Harper is

an "employer" within the meaning of DCHRA because she committed and/or aided and abetted

the unlawful acts to which Plaintiff was subjected.

<u>**Statement of Facts**</u>

9.      Waters commenced her employment with DYRS in August, 2005 as a Youth

Development Representative ("YDR").  Beginning in March 2010 she was assigned to the Youth

Service Center ("YSC").

10.     Fullilove previously worked for DYRS and after a break in service he returned in

June/July 2015 as the Deputy Director of Secured Programs with day-to-day management

responsibilities over YSC and the New Beginnings Youth Development Center ("New

-4-

Beginnings"). At times relevant to the issues herein, Fullilove also served as Acting Superintendent of YSC.

11.     When Fullilove returned to DYRS, Waters was out of work on medical leave. He contacted her several times by telephone to inquire about her health and her expected return date to work.

12.     Waters returned to her full-time duties at YSC in August 2015. Her immediate supervisor occupied the position of Supervisory Youth Development Representative ("SYDR"). Fullilove was Waters' 4th line supervisor up the chain of command.

13.     Between August and December 2015 Fullilove summoned Waters to his office many times inquiring about her health and general welfare. In response to Fullilove's inquiries during some of these meetings, Waters shared some personal matters, believing the inquiries were coming from a supervisor who genuinely cared about his subordinate's welfare.

14.     In November 2015 Waters was elected Vice President of the DYRS FOP Labor Committee ("Labor Committee") and came into office in January 2016.

15.     Fullilove was DYRS's primary representative in making significant union labor decisions with the Labor Committee. He was excited at the news that Waters was elected Vice-President of the Labor Committee because he would have additional reasons to interact with her. So when Waters assumed office in January, 2016 Fullilove offered her and union president an office to use at YSC to transact union business, which they accepted. Fullilove also exempted Waters from working overtime.

-5-

16.     Soon after Waters returned to work in August 2015 Fullilove began to greet her

with a hug every day when he saw her, which she tried unsuccessfully to avoid.  But by January

2016 his hugs became sexualized, grabbing and pulling Waters "full-frontal" into his body, as

she struggled to pull away from him or smack his hands away.  Fullilove responded in anger and

warned her not to move away from him or smack his hand.  These were humiliating and

embarrassing experiences for Waters, which was exacerbated by co-workers' comments to her

that "he's on you."  These hugs continued through January 2017.

17.     In February 2016 Fullilove started commenting on Waters' clothing and general

appearance.  He first commented that he liked how her pants fit, but she ignored him and walked

away, signaling that his comment was not welcomed.

18.     Another day in February 2016 Fullilove told Waters to remove her lipstick

because he doesn't like other men looking at her.  She curtly told him that she would wear

whatever lipstick she wanted and walked away.

19.     Beginning around January 2016, whenever Fullilove saw Waters performing

access control duties at the entrance to YSC, he always went to her line.  As she performed the

required "pat down", he grunted and made other sexual sounds as if he were enjoying himself.

These incidents were in the presence of other DYRS employees and visitors to YSC.

20.     One day in April 2016, Waters was standing in front of YSC when Fullilove

drove up and told her to get in his government-issued car.  When she said "no," he ordered her to

"get your ass" in the car.  Fearing for her safety and her job, Waters got in the car with Fullilove.

After he drove off the parking lot he startled her by touching her breast, as she tried to move her

-6-

body away.  Then he grabbed her hand and put it on his leg.  When she pulled away, he said "see

what you do to me," calling attention to his erection.  As she protested he told her to shut up and

put her hand on his groin, but she refused.  She left his car shocked, numb and scared because

Fullilove is a high level supervisor at DYRS.

21.    A few days later, Fullilove told Waters that Grade 9 promotions would be coming

out soon, that she should interview for the promotion because he would be the selecting official.

Fullilove told Waters that he would help her prepare for the interview, give her answers to

interview questions and generally show her how to answer questions.  He told her he would also

help her sister get a promotion.

22.    From January 2016 through January 2017 Fullilove ordered Waters off her post

virtually daily to report to his office, despite her efforts to avoid him.  During these meetings that

lasted sometimes up to several hours, he engaged her in sexually inappropriate conversations to

which she sometimes replied in kind out of fear for her job.  Sometimes he even required her to

sit with him behind his desk, and he would rub on her thigh and breasts.  Many times when

Waters was leaving Fullilove's office he would get behind her, grab her breasts and rear end,

gyrate on her, and get an erection.  She always left his office feeling violated, "dirty" and

helpless.

23.    In or around May 2016 during a meeting in Fullilove's office he mentioned a

scene from the TV show Empire and requested that Waters perform oral sex on him while he sat

at his desk.  Waters cursed at him and stormed out of his office.  He repeated this request several

-7-

other times, once even exposing himself to her, but she refused each time and ran out of his
office.

24.     Twice in his office in 2016 Fullilove tried to force Waters to have sexual
intercourse with him, but she was ultimately able to escape without consummation of the act.

25.     Waters was scared of disobeying Fullilove's orders to come to his office because
she did not want him to become angry with her and initiate disciplinary action for
insubordination and/or other fabricated violations.

26.     Waters was also scared of filing a complaint against Fullilove because he often
told her if she did he would deny everything, no one would believe her, and he bragged about his
close relationship with Harllee-Harper, suggesting that nothing would happen to him.

27.     Waters also believed that senior management at DYRS covered for one another
and would retaliate against her if she filed a complaint against Fullilove.

28.     Even when Waters tried to avoid Fullilove at work, he knew how to find her
because he monitored her whereabouts from the security cameras in his office.

29.     In August 2016 one of the SYDRs sent an email to Fullilove complaining about
Waters not working during overtime hours for which she volunteered because she was in his
office.  In response, Fullilove walked Waters to the PM Shift commander's office and asked the
two SYDRs who were present if they had a problem with Waters' work.  Both responded "no"
and added that Waters is a great worker because they too were afraid of Fullilove's position at
the agency.

-8-

30.     After Fullilove and Waters left the PM Shift commander's office, Waters told him that she would not come back to his office. Fullilove got upset and stated that he is the SYDR's supervisor and "fuck" what she was saying because Waters will come to his office when he orders her to come, and she will stop only when he decides.

31.     Once in October, 2016 Fullilove summoned Waters to his office over the walkie talkie, but she refused to answer. Fullilove then called the shift commander to tell Waters to report to his (Fullilove's) office, but Waters said she would not go. A few minutes later Fullilove came to the union office where she was working and stood outside the door. Approximately 30 minutes later Waters went to the door to ask Fullilove what he wanted. He told her he just wanted to talk; she told him she didn't and returned to her work. He stood outside the door for a while longer then he left.

32.     Fullilove arranged for Waters to have an all-access card so that she could get to his office whenever he ordered her there. However, around October/November 2016 Waters' all-access badge was cut off, as happened with other employees. When Fullilove learned about this, he ordered Waters to go and get another all-access card, but she didn't.

33.     From February 2016 through January 2017, Fullilove routinely called and texted Waters when she was off-duty and at home and engaged in sexually inappropriate conversations with her.

34.     During one phone conversation Fullilove told Waters to wear a burgundy bra to work the next day; she said okay to appease him. When she reported to work the next day, he

-9-

ordered her to his office and demanded to see if she was wearing the burgundy bra. When she

refused, he ordered her to comply. In fear she showed him her bra, which was not burgundy.

35.     Any time Waters rebuffed Fullilove's sexually inappropriate comments and/or

conduct he threatened to take back the union office, put her back on the draft where she would

have to work overtime, and not promote her to Grade 9.

36.     Waters also believed that if she "pushed back" too hard against Fullilove's sexual

misconduct toward her, he would orchestrate her termination.

37.     Fullilove even threatened to fire a male employee whom Fullilove believed had

the "hots" for Waters. Taking Fullilove's threat seriously, the employee found another job and

left DYRS.

38.     Fullilove's sexually inappropriate conduct toward Waters was widely-known

throughout DYRS, with supervisors often making comments about Fullilove's interaction with

Waters.

39.     Since at least March 2016, Harllee-Harper has known about Fullilove's sexual

harassment of Waters. In fact, during several meetings at DYRS's HQ and at the DC Council,

Harllee-Harper observed Fullilove invading Waters' personal space, hugging her, and engaging

in other inappropriate touching, as Waters leaned away, or tried to pull or get away from his

presence.

40.     Harllee-Harper did nothing to stop Fullilove's sexual harassment of Waters and

ignored rampant sexual harassment in her agency.

-10-

41.     In December 2016 Fullilove advised Waters that he was going to transfer her from YSC to New Beginnings because he would be moving there as soon as the new superintendent was hired for YSC.  Waters knew that if she were transferred to New Beginnings Fullilove would have even more leeway there to sexually harass her, so she told him she did not want a transfer.

42.     On or about December 14, 2016 Waters reported to her immediate supervisor that one of Fullilove's administrative staff almost hit her with a moving car in the parking lot at YSC.  It was widely rumored at DYRS that Fullilove and the administrative staff member had an ongoing sexual relationship.

43.     Within minutes of making the complaint, Fullilove called Waters and was irate when she explained that she went to her immediate supervisor hoping that an investigation would be conducted outside YSC.  However, the investigation was handled at YSC under Fullilove's supervision.

44.     Fullilove kept pressuring Waters about transferring to New Beginnings.  In late January 2017 Fullilove co-opted another co-worker to help convince Waters why a transfer to New Beginnings was a good idea.  He even told the co-worker that Waters would be interviewing for a Grade 9 promotion.  At that point Waters told him she didn't want a Grade 9 anymore, was tired of everything, and she started to cry.

45.     The stress and anxiety of Fullilove's sexual harassment of Waters reached critical mass on or about January 27, 2017 when Waters started experiencing chest pains, shortness of

-11-

breath, and numbness in her hands.  She was forced to seek emergency medical treatment and was out of work for a few days.

46.     On or about February 2, 2017 Waters filed a sexual harassment complaint with the D.C. Office of Human Rights ("OHR").

47.     On February 3, 2017, Waters also filed a sexual harassment claim with the human resources department of DYRS.  Within days Waters was transferred to New Beginnings where a pattern of retaliation against her began and persists to the present.

48.     During the first two weeks of Waters' transfer to New Beginnings, Fullilove visited approximately three times and made sure that Waters saw him, a move intended to intimidate her.

49.     After Waters notified DCHR about Fullilove's visits, upon information and belief, he was placed on administrative leave, but when he returned to New Beginnings he continued to make his presence known to Waters, always stopping to stare at her inappropriately.

50.     On February 23, 2017, less than 3 weeks after filing her sexual harassment complaint, Waters received a notice of proposed suspension for 10 days for alleged false statements relating to the complaint she filed on December 14, 2016 after nearly being hit by a car driven by Fullilove's administrative staff.  Defendants charged Waters' with making false statements, claiming that her statement that she feared for her safety was inconsistent with video footage of the parking lot where the incident took place.

-12-

51.     The proposed suspension was reduced to an Official Reprimand by final agency decision dated April 6, 2017.  This was the first time Waters was the subject of disciplinary action since DYRS hired her in 2005.

52.     DCHR conducted a sham investigation of Waters' sexual harassment complaint, focusing attention instead on (a) Fullilove's alleged misuse of government property when he allowed Waters to use an office at YSC for union activities, his use of an agency-issued cell phone to communicate with Waters, as well as his waste of agency time when he met with Waters privately in his office numerous times and discussed non-work related matters; and (b) Waters' alleged neglect of duty when she met with Fullilove in his office numerous times, and her off-duty communication with him.

53.     On or about February 21, 2017 Harllee-Harper stated during roll call at New Beginnings that she had "mixed feelings" about the investigation of Waters' sexual harassment complaint.

54.     During the sham investigation, one of Waters' co-workers confirmed to the investigator that he witnessed incidents of Fullilove sexually harassing Waters.  Upon information and belief, soon thereafter Harllee-Harper terminated the employee.

55.     Upon completion of the sham investigation, one of DYRS's senior staff advised Harllee-Harper to terminate Fullilove's employment because he was an embarrassment to the agency.  Harllee-Harper warned the senior staff that if he continued to make such comments she would discipline him for being insubordinate.

-13-

56.     DCHR concluded there was no sexual harassment of Waters because allegedly there was a consensual relationship between supervisor and subordinate on the job.

57.     On July 18, 2017 Defendants issued to Waters an Advance Written Notice of proposed suspension for 3 days for alleged neglect of duty, violation of the DC Ethics Code and the Employee Conduct Policy for the times she spent in meetings in Fullilove's office when he ordered her there and sexually harassed her.

58.     Harllee-Harper made the final decision to suspend Waters for 3 days based on investigation of her sexual harassment complaint, noting that the listed causes for discipline were "well-supported by the facts" in the Advance Written Notice.  Waters served her suspension from August 14-16, 2017.

59.     When Waters returned to work on August 17, 2017 she received notice of her reassignment to New Beginnings, effective August 28, 2017.

60.     However, on August 25, 2017, within a week of returning from suspension, Defendants placed Waters on administrative leave while an unspecified investigation was being conducted.  When Waters' union representative inquired about the nature of the investigation, including whether Waters was the subject of the investigation, Defendants did not respond.

61.     Around the end of August 2017 Waters received notice that she was being re-assigned from New Beginnings to DYRS's community location, the Achievement Center in SE Washington, DC where defendants Fullilove and Harllee Harper knew that she would come in contact with a former youth against whom Waters obtained a multi-year stay away order for threats and assault.

-14-

62.     On or about October 16, 2017, while still on administrative leave, Waters received a notice of proposed suspension for 10 days based on alleged misconduct on three different dates:  (a) that on July 18, 2017 she became upset and made unprofessional comments to a supervisor; (b) that on August 17, 2017 she approached a co-worker and allegedly made unprofessional, derogatory comments to him; and (c) that on August 24, 2017 during discussion in roll call about an incident involving a youth who touched a YDR in a sexual manner, she commented that the youth must have felt emboldened because upper management engages in such behavior without consequences.

63.     DYRS management, including Harllee-Harper, violated Waters' due process rights by failing to interview her about the alleged incidents and permitting the investigation to be conducted by "secured program" staff who were supervised by Fullilove.

64.     At the end of October, 2017 the charges were dismissed after Waters spent approximately two months on administrative leave.

65.     Waters returned to work on October 30, 2017 at DYRS's community location, the Achievement Center in SE Washington, DC where she went to work daily in fear of coming in contact with the youth against whom she has a stay away order.

66.     Upon information and belief, in November 2017, Harllee-Harper sought to have another employee file a complaint against Waters so that the disciplinary process could be initiated, but the employee refused to do so.

-15-

67. On or about December 18, 2017, Harllee-Harper transferred Waters back to YSC, under Fullilove's supervision, where she remains to the present. Whenever, Fullilove sees Waters, approximately 2-3 times per week, he continues to stare at her inappropriately.

68. Fullilove and Harllee-Harper directly or indirectly caused each of the foregoing retaliatory actions taken against Waters, and Waters believes said actions will continue so she goes to work in fear of termination every day.

69. Harllee-Harper presided over an agency that allowed her direct report to sexually harass Waters openly and without consequences while lower level employees are disciplined, including one lower-tiered supervisor who was terminated in April 2018 for hugging a subordinate over whom he had no direct supervision.

70. Defendants' conduct was outrageous, malicious, wanton, reckless, and/or in willful disregard of Waters' rights under the law.

**Count I**
**DCHRA - Hostile Work Environment Sexual Harassment (All Defendants)**

71. Plaintiff restates the allegations set forth in paragraphs 9-70 as if they were fully stated herein.

72. Plaintiff is a member of a protected class by virtue of her gender (female).

73. Plaintiff was subjected to unwelcome harassment by Defendants Fullilove and DC for over a year as set forth in the preceding paragraphs, including when Defendant Fullilove: (a) touched her breasts, thigh and other areas of her body; (b) requested sexual favors and acts from her; (c) attempted to have sex with her in his office; (d) ordered her to his office routinely to spend hours engaged in inappropriate sexual conduct; (e) promised her and her sister

-16-

promotions to Grade 9, allowed her to use YSC office for union activities and exempted her from mandatory overtime work; (f) made inappropriate comments about her appearance and ordered her to wear specific underwear to work; (g) communicated with her about sexual matters at work and after hours; (h) exposed his genitals to her; (i) required her to expose herself to him; and (j) threatened to take back privileges of union office at YSC and exemption from mandatory overtime work, and to renege on promised promotions.

74.    Defendant Harllee-Harper aided and abetted the sexual harassment because she knew Fullilove was sexually harassing Waters but did nothing to stop him. Even after Waters filed her sexual harassment complaint, Harllee-Harper refused to take any disciplinary action against Fullilove.

75.    The harassment was based on Plaintiff's membership in a protected class because it focused on her being female, and Defendants have not treated Plaintiff's male co-workers in like fashion.

76.    The harassment was severe and pervasive because it affected Plaintiff's ability to function at work, causing her to be uncomfortable in the workplace, with feelings of physical and emotional debilitation, and ultimately fear that Defendants would fire her and/or physically harm her. The harassment also caused Waters to seek emergency medical treatment and other medical and psychological treatment.

77.    Plaintiff believed her work environment to be hostile and/or abusive, and the series of incidents to which she was subjected are objectively hostile and/or abusive.

-17-

78. Defendants Fullilove and Harllee-Harper were acting within the scope of their employment with Defendant DC.

79. Defendant DCX allowed Fullilove and Harllee-Harper to sexually harass Waters with impunity.

80. As a direct and proximate result of this hostile work environment to which Plaintiff was subjected because of her gender, she suffered physical and emotional injuries, economic and non-economic losses, including lost wages, indignity, humiliation, embarrassment, and emotional distress.

WHEREFORE, Plaintiff prays that this Court enter judgment in her favor and against defendants, jointly and severally, as follows:

(a) award Plaintiff compensatory damages in an amount in excess of $2.5 million;

(b) award Plaintiff punitive damages in an amount in excess of $2.5 million against the individual Defendants;

(c) award Plaintiff statutory attorney's fees and costs incurred in bringing and maintaining this claim; and

(d) award Plaintiff such other and further relief as the interest of justice may require.

## Count II
### DCHRA - Quid Pro Quo Sexual Harassment (Defendants DC and Fullilove)

81. Plaintiff restates the allegations set forth in paragraphs 9-70 as if they were fully stated herein.

82. Plaintiff is a member of a protected class by virtue of her gender (female).

-18-

83.     Defendant Fullilove favored Plaintiff with use of an office at YSC for union activities, exempted her from working mandatory overtime, and promised to promote her to a Grade 9 and help with securing her sister's promotion to a Grade 9.

84.     Defendant Fullilove made unwelcomed sexual advances and/or requests for sexual favors from Plaintiff during orchestrated meetings in his office as detailed above, including when he requested that she perform oral sex and/or sexual intercourse with him, demanded that she show him covered areas of her body and/or her underwear, as well as rubbed against and otherwise touched her in a sexual manner.

85.     The harassment was based on Plaintiff's membership in a protected class because it focused on her being female, and Defendant Fullilove has not treated Plaintiff's male co-workers in like fashion.

86.     Plaintiff's submission to Fullilove's unwelcomed sexual advances and/or requests for sexual favors was a condition for her receiving the aforementioned job benefits and promises.

87.     When Plaintiff rebuffed Fullilove's unwelcomed sexual advances and/or requests for sexual favors, he threatened to take away her use of an office at YSC for union activities, return her to working mandatory overtime, and that he would renege on the promised promotions to Grade 9 for Plaintiff and her sister.

88.     At all times Defendant Fullilove was acting within the scope of his employment with Defendant DC.

89.     Defendant DC allowed Fullilove to sexually harass Plaintiff with impunity.

-19-

90.     As a direct and proximate result of this sexually harassing and abusive environment to which Plaintiff was subjected because of her gender, she suffered physical and emotional injuries, economic and non-economic losses, including lost wages, indignity, humiliation, embarrassment, and emotional distress.

WHEREFORE, Plaintiff prays that this Court enter judgment in her favor and against defendants, jointly and severally, as follows:

(a)   award Plaintiff compensatory damages in an amount in excess of $2.5 million;

(b)   award Plaintiff punitive damages in an amount in excess of $2.5 million against Defendant Fullilove;

(c)   award Plaintiff statutory attorney's fees and costs incurred in bringing and maintaining this claim; and

(d)   award Plaintiff such other and further relief as the interest of justice may require.

### Count III
### DCHRA - Retaliation (All Defendants)

91.     Plaintiff restates the allegations set forth in paragraphs 9-70 as if they were fully stated herein.

92.     Plaintiff engaged in statutorily protected activity when she filed complaints of sexual harassment with OHR and DYRS on February 2, 2017 and February 3, 2017, respectively, as well as her participation in the resulting investigations.

-20-

93.     As a direct and proximate cause of Plaintiff's protected activities Defendants

subjected her to adverse action(s) and a pattern of retaliatory harassment as set forth in the

preceding paragraphs from February 2017 through the present, including, but not limited to:

(a) 3 days suspension for spending time in Fullilove's office while he sexually harassed her;

(b) February 23, 2017 proposed 10-day suspension for alleged false statements; (c) April 6, 2017

Official Reprimand; (d) Harllee-Harper's February 21, 2017 statement in roll call that she had

"mixed feelings' about the investigation of Waters' sexual harassment complaint;

(e) termination of Waters' co-worker who corroborated incidents of Fullilove's sexual

harassment of her; (f) Harllee-Harper's intimidation of senior staff who recommended

Fullilove's termination; (g) the sham investigation of Waters' sexual harassment complaint;

(h) her August 25, 2017 through October 29, 2017 administrative leave during investigation for

unspecified charge or incidents; (i) keeping her under Fullilove's supervision; (j) October 16,

2017 notice of proposed suspension for 10 days and violation of due process rights during

investigation; (k) orchestrated attempts to get co-worker(s) to file complaints to discipline her;

and (l) Fullilove intimidating her with his presence and looks.

94.     There is a causal relationship between Plaintiff's protected activities and

Defendants' retaliatory actions against her.

95.     The foregoing retaliation and harassment was severe and pervasive because it has

been ongoing from February, 2017 to the present, and has affected the terms and conditions of

Plaintiff's employment, including causing her to obtain medical and mental health treatment, and

-21-

continuing to work in the constant fear that she will be subjected to further unjustified discipline and ultimately terminated from her employment with DYRS.

96.     Plaintiff believes her work environment to be hostile and abusive, and the series of retaliatory actions to which she has been subjected are objectively hostile and abusive.

97.     At all times Defendants Fullilove and Harllee-Harper were acting within the scope of their employment with Defendant DC.

98.     Defendant DC allowed Fullilove and Harllee-Harper to retaliate against Plaintiff with impunity.

99.     As a direct and proximate result of the foregoing retaliatory actions to which Plaintiff was subjected because of her protected activities, she suffered physical and emotional injuries, economic and non-economic losses, including lost wages, indignity, humiliation, embarrassment, and emotional distress.

WHEREFORE, Plaintiff prays that this Court enter judgment in her favor and against defendants, jointly and severally, as follows:

(a)   award Plaintiff compensatory damages in an amount in excess of $2.5 million;

(b)  award Plaintiff punitive damages in an amount in excess of $2.5 million against Defendants Fullilove and Harllee-Harper;

(c)   award Plaintiff statutory attorney's fees and costs incurred in bringing and maintaining this claim; and

(d)  award Plaintiff such other and further relief as the interest of justice may require.

-22-

## Count IV
### Violation of Section 1983 – Sexual Harassment (Fullilove and Harllee-Harper Only)

100.    Plaintiff restates the allegations set forth in paragraphs 9-70 as if they were fully stated herein.

101.    Plaintiff is a member of a protected class by virtue of her sex (female).

102.    As high level supervisors at DYRS Defendants Fullilove and Harllee-Harper know that sexual harassment is unlawful under the laws of the United States and the District of Columbia.

103.    Nevertheless, Defendant Fullilove subjected Plaintiff to unwelcome sexual harassment for over a year as set forth in the preceding paragraphs, including when Defendant Fullilove:  (a)  touched her breasts, thigh and other areas of her body; (b) requested sexual favors and acts from her; (c) attempted to have sex with her in his office; (d) ordered her to his office routinely to spend hours engaged in inappropriate sexual conduct; (e) promised her and her sister promotions to Grade 9, allowed her to use YSC office for union activities and exempted her from mandatory overtime work; (f) made inappropriate comments about her appearance and ordered her to wear specific underwear to work; (g) communicated with her about sexual matters at work and after hours; (h) exposed his genitals to her; (i) required her to expose herself to him; and (j) threatened to take back privileges of union office at YSC and exemption from mandatory overtime work, and to renege on promised promotions.

104.    Defendant Harllee-Harper aided and abetted the sexual harassment because she knew Fullilove was sexually harassing Waters but did nothing to stop him.  Even after Waters

-23-

filed her sexual harassment complaint, Harllee-Harper refused to take any disciplinary action against Fullilove.

105.    The harassment was based on Plaintiff's membership in a protected class because it focused on her being female, and Defendants have not treated Plaintiff's male co-workers in like fashion.

106.    The harassment was severe and pervasive because it affected Plaintiff's ability to function at work, causing her to be uncomfortable in the workplace, with feelings of physical and emotional debilitation, and ultimately fear that Defendants would fire her and/or physically harm her.

107.    Plaintiff believed her work environment to be hostile and/or abusive, and the series of incidents to which she was subjected are objectively hostile and/or abusive.

108.    Defendants Fullilove and Harllee-Harper were acting under color of law and within the scope of their employment with Defendant DC.

109.    As a direct and proximate result of this hostile work environment to which Plaintiff was subjected because of her gender, she suffered physical and emotional injuries, economic and non-economic losses, including lost wages, indignity, humiliation, embarrassment, and emotional distress.

WHEREFORE, Plaintiff prays that this Court enter judgment in her favor and against Defendants Fullilove and Harllee-Harper, jointly and severally, as follows:

(a) award Plaintiff compensatory damages in an amount in excess of $2.5 million;

(b) award Plaintiff punitive damages in an amount in excess of $ 2.5 million;

-24-

(c)  award Plaintiff statutory attorney's fees and costs incurred in bringing and maintaining this claim; and

(d)  award Plaintiff such other and further relief as the interest of justice may require.

## Count IV
### Violation of Section 1983 – Retaliation (Fullilove and Harlee-Harper Only)

110.   Plaintiff restates the allegations set forth in paragraphs 9-70 as if they were fully stated herein.

111.   As high level supervisors at DYRS Defendants know that retaliation for an employee's complaint about sexual harassment is unlawful under the laws of the United States and the District of Columbia.

112.   Plaintiff engaged in statutorily protected activity when she filed complaints of sexual harassment with OHR and DYRS on February 2, 2017 and February 3, 2017, respectively, as well as her participation in the resulting investigations.

113.   As a direct and proximate cause of Plaintiff's protected activities Defendants, subjected her to adverse action(s) and a pattern of retaliatory harassment as set forth in the preceding paragraphs from February 2017 through the present, including, but not limited to:  (a) 3 days suspension for spending time in Fullilove's office while he sexually harassed her; (b) February 23, 2017 proposed 10-day suspension for alleged false statements; (c) April 6, 2017 Official Reprimand; (d) Harllee-Harper's February 21,.2017 statement in roll call that she had "mixed feelings' about the investigation of Waters' sexual harassment complaint; (e) termination of Waters' co-worker who corroborated incidents of Fullilove's sexual harassment of her;

-25-

(f) Harllee-Harper's intimidation of senior staff who recommended Fullilove's termination; (g) the sham investigation of Waters' sexual harassment complaint; (h) her August 25, 2017 through October 29, 2017 administrative leave during investigation for unspecified charge or incidents; (i) keeping her under Fullilove's supervision; (j) October 16, 2017 notice of proposed suspension for 10 days and violation of due process rights during investigation; (k) orchestrated attempts to get co-worker(s) to file complaints to discipline her; and (l) Fullilove intimidating her with his presence and looks.

114.    There is a causal relationship between Plaintiff's protected activities and Defendants' retaliatory actions against her.

115.    The foregoing retaliation and harassment was severe and pervasive because it has been ongoing from February, 2017 to the present, and has affected the terms and conditions of Plaintiff's employment, including causing her to obtain medical and mental health treatment, and continuing to work in the constant fear that she will be subjected to further unjustified discipline and ultimately terminated from her employment with DYRS.

116.    Plaintiff believes her work environment to be hostile and abusive, and the series of retaliatory actions to which she has been subjected are objectively hostile and abusive.

117.    At all times Defendants Fullilove and Harllee-Harper were acting under color of law and within the scope of their employment with Defendant DC.

118.    As a direct and proximate result of the foregoing retaliatory actions to which Plaintiff was subjected because of her protected activities, she suffered physical and emotional

-26-

injuries, economic and non-economic losses, including lost wages, indignity, humiliation, embarrassment, and emotional distress.

WHEREFORE, Plaintiff prays that this Court enter judgment in her favor and against Defendants Fullilove and Harllee-Harper, jointly and severally, as follows:

(a)   award Plaintiff compensatory damages in an amount in excess of $2.5 million;

(b)   award Plaintiff punitive damages in an amount in excess of $2.5 million against Defendants Fullilove and Harllee-Harper;

(c)   award Plaintiff statutory attorney's fees and costs incurred in bringing and maintaining this claim; and

(d)   award Plaintiff such other and further relief as the interest of justice may require.

### Jury Demand

Plaintiff demands a trial by jury on all counts of this Complaint.

Respectfully submitted,

*/s/  Jeanett P. Henry*
Jeanett P. Henry, Bar No. 411052
8403 Colesville Road
Suite 1100
Silver Spring, MD 20910
(301) 562-1340
(240) 638-2701 (fax)
Email:  jhenry2085@aol.com

***Attorney for Plaintiff***

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

Kim Waters

Case Number: 2018 CA 007054 B

vs

Date: Oct. 3, 2018

District of Columbia et. al

☐ One of the defendants is being sued
in their official capacity.

Name: *(Please Print)*
Jeanett P. Henry

Firm Name:
Law office of Jeanett P. Henry

Telephone No.:        Six digit Unified Bar No.:
(301) 562-1340       411052

Relationship to Lawsuit

☑ Attorney for Plaintiff

☐ Self (Pro Se)

☐ Other: _____

TYPE OF CASE:  ☐ Non-Jury    ☑ 6 Person Jury    ☐ 12 Person Jury
Demand: $ 5 million        Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.: N/A _____ Judge: _____ Calendar #: _____

Case No.: _____ Judge: _____ Calendar#: _____

---

**NATURE OF SUIT:**    *(Check One Box Only)*

## A. CONTRACTS

COLLECTION CASES

☐ 01 Breach of Contract
☐ 02 Breach of Warranty
☐ 06 Negotiable Instrument
☐ 07 Personal Property
☒ 13 Employment Discrimination
☐ 15 Special Education Fees

☐ 14 Under $25,000 Pltf. Grants Consent
☐ 17 OVER $25,000 Pltf. Grants Consent
☐ 27 Insurance/Subrogation
    Over $25,000 Pltf. Grants Consent
☐ 07 Insurance/Subrogation
    Under $25,000 Pltf. Grants Consent
☐ 28 Motion to Confirm Arbitration
    Award (Collection Cases Only)

☐ 16 Under $25,000 Consent Denied
☐ 18 OVER $25,000 Consent Denied
☐ 26 Insurance/Subrogation
    Over $25,000 Consent Denied
☐ 34 Insurance/Subrogation
    Under $25,000 Consent Denied

## B. PROPERTY TORTS

☐ 01 Automobile
☐ 02 Conversion
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

☐ 03 Destruction of Private Property
☐ 04 Property Damage

☐ 05 Trespass

## C. PERSONAL TORTS

☐ 01 Abuse of Process
☐ 02 Alienation of Affection
☐ 03 Assault and Battery
☐ 04 Automobile- Personal Injury
☐ 05 Deceit (Misrepresentation)
☐ 06 False Accusation
☐ 07 False Arrest
☐ 08 Fraud

☐ 10 Invasion of Privacy
☐ 11 Libel and Slander
☐ 12 Malicious Interference
☐ 13 Malicious Prosecution
☐ 14 Malpractice Legal
☐ 15 Malpractice Medical (Including Wrongful Death)
☐ 16 Negligence- (Not Automobile,
    Not Malpractice)

☐ 17 Personal Injury- (Not Automobile,
    Not Malpractice)
☐ 18 Wrongful Death (Not Malpractice)
☐ 19 Wrongful Eviction
☐ 20 Friendly Suit
☐ 21 Asbestos
☐ 22 Toxic/Mass Torts
☐ 23 Tobacco
☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE        IF USED

CV-496/June 2015

# Information Sheet, Continued

**C. OTHERS**

- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 05 Ejectment
- ☐ 09 Special Writ/Warrants
  (DC Code § 11-941)
- ☐ 10 Traffic Adjudication
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☐ 16 Declaratory Judgment

- ☐ 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability

- ☐ 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☐ 33 Whistleblower

**II.**

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment/Domestic
- ☐ 08 Foreign Judgment/International
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  Certificate
- ☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
- ☐ 27 Petition for Civil Asset Forfeiture (Currency)
- ☐ 28 Petition for Civil Asset Forfeiture (Other)

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- ☐ 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

**D. REAL PROPERTY**

- ☐ 09 Real Property-Real Estate
- ☐ 12 Specific Performance
- ☐ 04 Condemnation (Eminent Domain)
- ☐ 10 Mortgage Foreclosure/Judicial Sale
- ☐ 11 Petition for Civil Asset Forfeiture (RP)

- ☐ 08 Quiet Title
- ☐ 25 Liens: Tax / Water Consent Granted
- ☐ 30 Liens: Tax / Water Consent Denied
- ☐ 31 Tax Lien Bid Off Certificate Consent Granted

_Jeanett P. Henry_
Attorney's Signature

_Oct. 3, 2018_
Date

CV-496/ June 2015

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

| | | |
|---|---|---|
| **Kim Waters**, | : | |
| 515 Bolin Terrace | | |
| Upper Marlboro, MD 20774 | : | |
| | | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 2018 CA 007054 B |
| | | |
| **District of Columbia** | : | Judge Neal E. Kravitz |
| Serve:  Muriel Bowser, Mayor | | |
| 1350 Pennsylvania Avenue, NW | : | Nest Event:  Initial Conference – 01/04/2019 |
| Washington, DC 20001 | | |
| | : | |
| Serve:  Karl A. Racine, Esquire | | |
| Attorney General for DC | : | |
| 441 4th Street, NW | | |
| Washington, DC 20001 | : | |
| | | |
| and | : | |
| | | |
| **Willie Fullilove**, | : | |
| c/o Department of Youth Rehab. Servs. | | |
| 450 H Street, NW | : | |
| Washington, DC 20001 | | |
| | | |
| and | : | |
| | | |
| **Linda Harllee-Harper**, | : | |
| c/o Department of Youth Rehab. Servs. | | |
| 450 H Street, NW | : | |
| Washington, DC 20001 | | |
| | | |
| Defendants. | : | |

_____

## AMENDED COMPLAINT
### (Employment Discrimination)

## Introduction

1. Plaintiff, Kim Waters, brings suit for damages she sustained in violation of the

-2-

District of Columbia Human Rights Act ("DCHRA"), D.C. Code, §§2-1401 through 2-1403 and 42 U.S.C. §1983.  Specifically, Kim Waters contends that her employers subjected her to a sexually harassing working environment based on her gender and retaliated against her for complaining about sexual harassment in violation of the DCHRA and the Equal Protection Clause (Article 14) of the United States Constitution as applicable to the District of Columbia through the Fifth Amendment's Due Process Clause.

### Jurisdiction & Venue

2.     This Court has jurisdiction over this cause of action pursuant to D.C. Code § 2-1403.16, as the plaintiff alleges violations of the D.C. Human Rights Act, and pursuant to D.C. Code § 11-921, as the amount in controversy exceeds ten thousand dollars ($10,000.00).

3.   Venue is proper in this Court because a substantial part of the acts and omissions that give rise to this Complaint occurred within the District of Columbia.  Venue is further proper because Defendants have offices in the District of Columbia.

4.   On or about February 2, 2017 Waters filed a complaint of sexual harassment and retaliation with the D.C. Office of Human Rights.  On or about May 22, 2018 she obtained an administrative dismissal of such claims.

### Parties

5.   Plaintiff, Kim Waters ("Waters"), a female resident of Maryland, has been employed at the Department of Youth Rehabilitation Services ("DYRS") since 2005.

-3-

6.      Defendant, District of Columbia (the "District" or "DC"), a municipal corporation, functions through various agencies, including DYRS, which is responsible for the supervision, custody, and care of adolescents charged with delinquent acts in the District of Columbia.  As the employer of the individual defendants, the District is liable for their actions under the doctrine of *respondeat superior.*

7.      Defendant, Willie Fullilove ("Fullilove"), has been the Deputy Director of Secured Programs at DYRS.   At all times relevant herein, he acted within the scope of his employment with defendant District of Columbia.  He is being sued in his individual capacity. Fullilove is an "employer" within the meaning of the DCHRA because he committed and/or aided and abetted the unlawful acts to which Waters was subjected.

8.      Defendant, Linda Harllee-Harper ("Harllee-Harper"), has been the Senior Deputy Director of DYRS and Fullilove's immediate supervisor.  Upon information and belief, Harllee-Harper is charged with the day-to-day operations of the agency and reports to the agency director.  At all times relevant herein, she acted within the scope of her employment with defendant District of Columbia.  She is being sued in her individual capacity.  Harllee-Harper is an "employer" within the meaning of DCHRA because she committed and/or aided and abetted the unlawful acts to which Plaintiff was subjected.

**Statement of Facts**

9.      Waters commenced her employment with DYRS in August, 2005 as a Youth Development Representative ("YDR").  Beginning in March 2010 she was assigned to the Youth Service Center ("YSC").

-4-

10.     Fullilove previously worked for DYRS and after a break in service he returned in June/July 2015 as the Deputy Director of Secured Programs with day-to-day management responsibilities over YSC and the New Beginnings Youth Development Center ("New Beginnings").  At times relevant to the issues herein, Fullilove also served as Acting Superintendent of YSC.

11.     When Fullilove returned to DYRS, Waters was out of work on medical leave.  He contacted her several times by telephone to inquire about her health and her expected return date to work.

12.     Waters returned to her full-time duties at YSC in August 2015.  Her immediate supervisor occupied the position of Supervisory Youth Development Representative ("SYDR"). Fullilove was Waters' 4th line supervisor up the chain of command.

13.     Between August and December 2015 Fullilove summoned Waters to his office many times inquiring about her health and general welfare. In response to Fullilove's inquiries during some of these meetings, Waters shared some personal matters, believing the inquiries were coming from a supervisor who genuinely cared about his subordinate's welfare.

14.     In November 2015 Waters was elected Vice President of the DYRS FOP Labor Committee ("Labor Committee") and came into office in January 2016.

15.     Fullilove was DYRS's primary representative in making significant union labor decisions with the Labor Committee.  He was excited at the news that Waters was elected Vice-President of the Labor Committee because he would have additional reasons to interact with her. So when Waters assumed office in January, 2016 Fullilove offered her and union president an

-5-

office to use at YSC to transact union business, which they accepted.  Fulilove also exempted

Waters from working overtime.

16.     Soon after Waters returned to work in August 2015 Fullilove began to greet her

with a hug every day when he saw her, which she tried unsuccessfully to avoid.  But by January

2016 his hugs became sexualized, grabbing and pulling Waters "full-frontal" into his body, as

she struggled to pull away from him or smack his hands away.  Fullilove responded in anger and

warned her not to move away from him or smack his hand.  These were humiliating and

embarrassing experiences for Waters, which was exacerbated by co-workers' comments to her

that "he's on you."  These hugs continued through January 2017.

17.     In February 2016 Fullilove started commenting on Waters' clothing and general

appearance.  He first commented that he liked how her pants fit, but she ignored him and walked

away, signaling that his comment was not welcomed.

18.     Another day in February 2016 Fullilove told Waters to remove her lipstick

because he doesn't like other men looking at her.  She curtly told him that she would wear

whatever lipstick she wanted and walked away.

19.     Beginning around January 2016, whenever Fullilove saw Waters performing

access control duties at the entrance to YSC, he always went to her line.  As she performed the

required "pat down", he grunted and made other sexual sounds as if he were enjoying himself.

These incidents were in the presence of other DYRS employees and visitors to YSC.

20.     One day in April 2016, Waters was standing in front of YSC when Fullilove

drove up and told her to get in his government-issued car.  When she said "no," he ordered her to

-6-

"get your ass" in the car.  Fearing for her safety and her job, Waters got in the car with Fullilove.

After he drove off the parking lot he startled her by touching her breast, as she tried to move her

body away.  Then he grabbed her hand and put it on his leg.  When she pulled away, he said "see

what you do to me," calling attention to his erection.  As she protested he told her to shut up and

put her hand on his groin, but she refused.  She left his car shocked, numb and scared because

Fullilove is a high level supervisor at DYRS.

21.     A few days later, Fullilove told Waters that Grade 9 promotions would be coming

out soon, that she should interview for the promotion because he would be the selecting official.

Fullilove told Waters that he would help her prepare for the interview, give her answers to

interview questions and generally show her how to answer questions.  He told her he would also

help her sister get a promotion.

22.     From January 2016 through January 2017 Fullilove ordered Waters off her post

virtually daily to report to his office, despite her efforts to avoid him.  During these meetings that

lasted sometimes up to several hours, he engaged her in sexually inappropriate conversations to

which she sometimes replied in kind out of fear for her job.  Sometimes he even required her to

sit with him behind his desk, and he would rub on her thigh and breasts.  Many times when

Waters was leaving Fullilove's office he would get behind her, grab her breasts and rear end,

gyrate on her, and get an erection.  She always left his office feeling violated, "dirty" and

helpless.

-7-

23.     In or around May 2016 during a meeting in Fullilove's office he mentioned a
scene from the TV show Empire and requested that Waters perform oral sex on him while he sat
at his desk.  Waters cursed at him and stormed out of his office.  He repeated this request several
other times, once even exposing himself to her, but she refused each time and ran out of his
office.

24.     Twice in his office in 2016 Fullilove tried to force Waters to have sexual
intercourse with him, but she was ultimately able to escape without consummation of the act.

25.     Waters was scared of disobeying Fullilove's orders to come to his office because
she did not want him to become angry with her and initiate disciplinary action for
insubordination and/or other fabricated violations.

26.     Waters was also scared of filing a complaint against Fullilove because he often
told her if she did he would deny everything, no one would believe her, and he bragged about his
close relationship with Harllee-Harper, suggesting that nothing would happen to him.

27.     Waters also believed that senior management at DYRS covered for one another
and would retaliate against her if she filed a complaint against Fullilove.

28.     Even when Waters tried to avoid Fullilove at work, he knew how to find her
because he monitored her whereabouts from the security cameras in his office.

29.     In August 2016 one of the SYDRs sent an email to Fullilove complaining about
Waters not working during overtime hours for which she volunteered because she was in his
office.  In response, Fullilove walked Waters to the PM Shift commander's office and asked the
two SYDRs who were present if they had a problem with Waters' work.  Both responded "no"

-8-

and added that Waters is a great worker because they too were afraid of Fullilove's position at the agency.

30.     After Fullilove and Waters left the PM Shift commander's office, Waters told him that she would not come back to his office.  Fullilove got upset and stated that he is the SYDR's supervisor and "fuck" what she was saying because Waters will come to his office when he orders her to come, and she will stop only when he decides.

31.     Once in October, 2016 Fullilove summoned Waters to his office over the walkie talkie, but she refused to answer.  Fullilove then called the shift commander to tell Waters to report to his (Fullilove's) office, but Waters said she would not go.  A few minutes later Fullilove came to the union office where she was working and stood outside the door. Approximately 30 minutes later Waters went to the door to ask Fullilove what he wanted.  He told her he just wanted to talk; she told him she didn't and returned to her work.  He stood outside the door for a while longer then he left.

32.     Fullilove arranged for Waters to have an all-access card so that she could get to his office whenever he ordered her there.  However, around October/November 2016 Waters' all-access badge was cut off, as happened with other employees.  When Fullilove learned about this, he ordered Waters to go and get another all-access card, but she didn't.

33.     From February 2016 through January 2017, Fullilove routinely called and texted Waters when she was off-duty and at home and engaged in sexually inappropriate conversations with her.

-9-

34.     During one phone conversation Fullilove told Waters to wear a burgundy bra to work the next day; she said okay to appease him. When she reported to work the next day, he ordered her to his office and demanded to see if she was wearing the burgundy bra.  When she refused, he ordered her to comply.  In fear she showed him her bra, which was not burgundy.

35.     Any time Waters rebuffed Fullilove's sexually inappropriate comments and/or conduct he threatened to take back the union office, put her back on the draft where she would have to work overtime, and not promote her to Grade 9.

36.     Waters also believed that if she "pushed back" too hard against Fullilove's sexual misconduct toward her, he would orchestrate her termination.

37.     Fullilove even threatened to fire a male employee whom Fullilove believed had the "hots" for Waters.  Taking Fullilove's threat seriously, the employee found another job and left DYRS.

38.     Fullilove's sexually inappropriate conduct toward Waters was widely-known throughout DYRS, with supervisors often making comments about Fullilove's interaction with Waters.

39.     Since at least March 2016, Harllee-Harper has known about Fullilove's sexual harassment of Waters.  In fact, during several meetings at DYRS's HQ and at the DC Council, Harllee-Harper observed Fullilove invading Waters' personal space, hugging her, and engaging in other inappropriate touching, as Waters leaned away, or tried to pull or get away from his presence.

-10-

40.     Harllee-Harper did nothing to stop Fullilove's sexual harassment of Waters and ignored rampant sexual harassment in her agency.

41.     In December 2016 Fullilove advised Waters that he was going to transfer her from YSC to New Beginnings because he would be moving there as soon as the new superintendent was hired for YSC.  Waters knew that if she were transferred to New Beginnings Fullilove would have even more leeway there to sexually harass her, so she told him she did not want a transfer.

42.     On or about December 14, 2016 Waters reported to her immediate supervisor that one of Fullilove's administrative staff almost hit her with a moving car in the parking lot at YSC. It was widely rumored at DYRS that Fullilove and the administrative staff member had an ongoing sexual relationship.

43.     Within minutes of making the complaint, Fullilove called Waters and was irate when she explained that she went to her immediate supervisor hoping that an investigation would be conducted outside YSC.  However, the investigation was handled at YSC under Fullilove's supervision.

44.     Fullilove kept pressuring Waters about transferring to New Beginnings.  In late January 2017 Fullilove co-opted another co-worker to help convince Waters why a transfer to New Beginnings was a good idea.  He even told the co-worker that Waters would be interviewing for a Grade 9 promotion.  At that point Waters told him she didn't want a Grade 9 anymore, was tired of everything, and she started to cry.

-11-

45.    The stress and anxiety of Fullilove's sexual harassment of Waters reached critical

mass on or about January 27, 2017 when Waters started experiencing chest pains, shortness of

breath, and numbness in her hands.  She was forced to seek emergency medical treatment and

was out of work for a few days.

46.    On or about February 2, 2017 Waters filed a sexual harassment complaint with

the D.C. Office of Human Rights ("OHR").

47.    On February 3, 2017, Waters also filed a sexual harassment claim with the human

resources department of DYRS.  Within days Waters was transferred to New Beginnings where a

pattern of retaliation against her began and persists to the present.

48.    During the first two weeks of Waters' transfer to New Beginnings, Fullilove

visited approximately three times and made sure that Waters saw him, a move intended to

intimidate her.

49.    After Waters notified DCHR about Fullilove's visits, upon information and belief,

he was placed on administrative leave, but when he returned to New Beginnings he continued to

make his presence known to Waters, always stopping to stare at her inappropriately.

50.    On February 23, 2017, less than 3 weeks after filing her sexual harassment

complaint, Waters received a notice of proposed suspension for 10 days for alleged false

statements relating to the complaint she filed on December 14, 2016 after nearly being hit by a

car driven by Fullilove's administrative staff.  Defendants charged Waters' with making false

statements, claiming that her statement that she feared for her safety was inconsistent with video

footage of the parking lot where the incident took place.

-12-

51.     The proposed suspension was reduced to an Official Reprimand by final agency decision dated April 6, 2017.  This was the first time Waters was the subject of disciplinary action since DYRS hired her in 2005.

52.     DCHR conducted a sham investigation of Waters' sexual harassment complaint, focusing attention instead on (a) Fullilove's alleged misuse of government property when he allowed Waters to use an office at YSC for union activities, his use of an agency-issued cell phone to communicate with Waters, as well as his waste of agency time when he met with Waters privately in his office numerous times and discussed non-work related matters; and (b) Waters' alleged neglect of duty when she met with Fullilove in his office numerous times, and her off-duty communication with him.

53.     On or about February 21, 2017 Harllee-Harper stated during roll call at New Beginnings that she had "mixed feelings" about the investigation of Waters' sexual harassment complaint.

54.     During the sham investigation, one of Waters' co-workers confirmed to the investigator that he witnessed incidents of Fullilove sexually harassing Waters.  Upon information and belief, soon thereafter Harllee-Harper terminated the employee.

55.     Upon completion of the sham investigation, one of DYRS's senior staff advised Harllee-Harper to terminate Fullilove's employment because he was an embarrassment to the agency.  Harllee-Harper warned the senior staff that if he continued to make such comments she would discipline him for being insubordinate.

-13-

56.     DCHR concluded there was no sexual harassment of Waters because allegedly there was a consensual relationship between supervisor and subordinate on the job.

57.     On July 18, 2017 Defendants issued to Waters an Advance Written Notice of proposed suspension for 3 days for alleged neglect of duty, violation of the DC Ethics Code and the Employee Conduct Policy for the times she spent in meetings in Fullilove's office when he ordered her there and sexually harassed her.

58.     Harllee-Harper made the final decision to suspend Waters for 3 days based on investigation of her sexual harassment complaint, noting that the listed causes for discipline were "well-supported by the facts" in the Advance Written Notice.  Waters served her suspension from August 14-16, 2017.

59.     When Waters returned to work on August 17, 2017 she received notice of her reassignment to New Beginnings, effective August 28, 2017.

60.     However, on August 25, 2017, within a week of returning from suspension, Defendants placed Waters on administrative leave while an unspecified investigation was being conducted.  When Waters' union representative inquired about the nature of the investigation, including whether Waters was the subject of the investigation, Defendants did not respond.

61.     Around the end of August 2017 Waters received notice that she was being re-assigned from New Beginnings to DYRS's community location, the Achievement Center in SE Washington, DC where defendants Fullilove and Harllee Harper knew that she would come in contact with a former youth against whom Waters obtained a multi-year stay away order for threats and assault.

-14-

62.     On or about October 16, 2017, while still on administrative leave, Waters

received a notice of proposed suspension for 10 days based on alleged misconduct on three

different dates:  (a) that on July 18, 2017 she became upset and made unprofessional comments

to a supervisor; (b) that on August 17, 2017 she approached a co-worker and allegedly made

unprofessional, derogatory comments to him; and (c) that on August 24, 2017 during discussion

in roll call about an incident involving a youth who touched a YDR in a sexual manner, she

commented that the youth must have felt emboldened because upper management engages in

such behavior without consequences.

63.     DYRS management, including Harllee-Harper, violated Waters' due process

rights by failing to interview her about the alleged incidents and permitting the investigation to

be conducted by "secured program" staff who were supervised by Fullilove.

64.     At the end of October, 2017 the charges were dismissed after Waters spent

approximately two months on administrative leave.

65.     Waters returned to work on October 30, 2017 at DYRS's community location, the

Achievement Center in SE Washington, DC where she went to work daily in fear of coming in

contact with the youth against whom she has a stay away order.

66.     Upon information and belief, in November 2017, Harllee-Harper sought to have

another employee file a complaint against Waters so that the disciplinary process could be

initiated, but the employee refused to do so.

-15-

67.     On or about December 18, 2017, Harllee-Harper transferred Waters back to YSC, under Fullilove's supervision, where she remains to the present.  Whenever, Fullilove sees Waters, approximately 2-3 times per week, he continues to stare at her inappropriately.

68.     Fullilove and Harllee-Harper directly or indirectly caused each of the foregoing retaliatory actions taken against Waters, and Waters believes said actions will continue so she goes to work in fear of termination every day.

69.     Harllee-Harper presided over an agency that allowed her direct report to sexually harass Waters openly and without consequences while lower level employees are disciplined, including one lower-tiered supervisor who was terminated in April 2018 for hugging a subordinate over whom he had no direct supervision.

70.     Defendants' conduct was outrageous, malicious, wanton, reckless, and/or in willful disregard of Waters' rights under the law.

**Count I**
**DCHRA - Hostile Work Environment Sexual Harassment (All Defendants)**

71.     Plaintiff restates the allegations set forth in paragraphs 9-70 as if they were fully stated herein.

72.     Plaintiff is a member of a protected class by virtue of her gender (female).

73.     Plaintiff was subjected to unwelcome harassment by Defendants Fullilove and DC for over a year as set forth in the preceding paragraphs, including when Defendant Fullilove: (a)  touched her breasts, thigh and other areas of her body; (b) requested sexual favors and acts from her; (c) attempted to have sex with her in his office; (d) ordered her to his office routinely to spend hours engaged in inappropriate sexual conduct; (e) promised her and her sister

-16-

promotions to Grade 9, allowed her to use YSC office for union activities and exempted her from mandatory overtime work; (f) made inappropriate comments about her appearance and ordered her to wear specific underwear to work; (g) communicated with her about sexual matters at work and after hours; (h) exposed his genitals to her; (i) required her to expose herself to him; and (j) threatened to take back privileges of union office at YSC and exemption from mandatory overtime work, and to renege on promised promotions.

74.     Defendant Harllee-Harper aided and abetted the sexual harassment because she knew Fullilove was sexually harassing Waters but did nothing to stop him.  Even after Waters filed her sexual harassment complaint, Harllee-Harper refused to take any disciplinary action against Fullilove.

75.     The harassment was based on Plaintiff's membership in a protected class because it focused on her being female, and Defendants have not treated Plaintiff's male co-workers in like fashion.

76.     The harassment was severe and pervasive because it affected Plaintiff's ability to function at work, causing her to be uncomfortable in the workplace, with feelings of physical and emotional debilitation, and ultimately fear that Defendants would fire her and/or physically harm her.  The harassment also caused Waters to seek emergency medical treatment and other medical and psychological treatment.

77.     Plaintiff believed her work environment to be hostile and/or abusive, and the series of incidents to which she was subjected are objectively hostile and/or abusive.

-17-

78.     Defendants Fullilove and Harllee-Harper were acting within the scope of their employment with Defendant DC.

79.     Defendant DCX allowed Fullilove and Harllee-Harper to sexually harass Waters with impunity.

80.     As a direct and proximate result of this hostile work environment to which Plaintiff was subjected because of her gender, she suffered physical and emotional injuries, economic and non-economic losses, including lost wages, indignity, humiliation, embarrassment, and emotional distress.

WHEREFORE, Plaintiff prays that this Court enter judgment in her favor and against defendants, jointly and severally, as follows:

(a)  award Plaintiff compensatory damages in an amount in excess of  $2.5 million;

(b)  award Plaintiff punitive damages in an amount in excess of $2.5 million against the individual Defendants;

(c)   award Plaintiff statutory attorney's fees and costs incurred in bringing and maintaining this claim; and

(d)  award Plaintiff such other and further relief as the interest of justice may require.

## Count II
## DCHRA - Quid Pro Quo Sexual Harassment (Defendants DC and Fullilove)

81.     Plaintiff restates the allegations set forth in paragraphs 9-70 as if they were fully stated herein.

82.     Plaintiff is a member of a protected class by virtue of her gender (female).

-18-

83. Defendant Fullilove favored Plaintiff with use of an office at YSC for union activities, exempted her from working mandatory overtime, and promised to promote her to a Grade 9 and help with securing her sister's promotion to a Grade 9.

84. Defendant Fullilove made unwelcomed sexual advances and/or requests for sexual favors from Plaintiff during orchestrated meetings in his office as detailed above, including when he requested that she perform oral sex and/or sexual intercourse with him, demanded that she show him covered areas of her body and/or her underwear, as well as rubbed against and otherwise touched her in a sexual manner.

85. The harassment was based on Plaintiff's membership in a protected class because it focused on her being female, and Defendant Fullilove has not treated Plaintiff's male co-workers in like fashion.

86. Plaintiff's submission to Fullilove's unwelcomed sexual advances and/or requests for sexual favors was a condition for her receiving the aforementioned job benefits and promises.

87. When Plaintiff rebuffed Fullilove's unwelcomed sexual advances and/or requests for sexual favors, he threatened to take away her use of an office at YSC for union activities, return her to working mandatory overtime, and that he would renege on the promised promotions to Grade 9 for Plaintiff and her sister.

88. At all times Defendant Fullilove was acting within the scope of his employment with Defendant DC.

89. Defendant DC allowed Fullilove to sexually harass Plaintiff with impunity.

-19-

90.     As a direct and proximate result of this sexually harassing and abusive environment to which Plaintiff was subjected because of her gender, she suffered physical and emotional injuries, economic and non-economic losses, including lost wages, indignity, humiliation, embarrassment, and emotional distress.

WHEREFORE, Plaintiff prays that this Court enter judgment in her favor and against defendants, jointly and severally, as follows:

(a)   award Plaintiff compensatory damages in an amount in excess of  $2.5 million;

(b)   award Plaintiff punitive damages in an amount in excess of $2.5 million against Defendant Fullilove;

(c)   award Plaintiff statutory attorney's fees and costs incurred in bringing and maintaining this claim; and

(d)   award Plaintiff such other and further relief as the interest of justice may require.

## Count III
## DCHRA - Retaliation (All Defendants)

91.     Plaintiff restates the allegations set forth in paragraphs 9-70 as if they were fully stated herein.

92.     Plaintiff engaged in statutorily protected activity when she filed complaints of sexual harassment with OHR and DYRS on February 2, 2017 and February 3, 2017, respectively, as well as her participation in the resulting investigations.

-20-

93.     As a direct and proximate cause of Plaintiff's protected activities Defendants

subjected her to adverse action(s) and a pattern of retaliatory harassment as set forth in the

preceding paragraphs from February 2017 through the present, including, but not limited to:

(a) 3 days suspension for spending time in Fullilove's office while he sexually harassed her;

(b) February 23, 2017 proposed 10-day suspension for alleged false statements; (c) April 6, 2017

Official Reprimand; (d) Harllee-Harper's February 21, 2017 statement in roll call that she had

"mixed feelings' about the investigation of Waters' sexual harassment complaint;

(e) termination of Waters' co-worker who corroborated incidents of Fullilove's sexual

harassment of her; (f) Harllee-Harper's intimidation of senior staff who recommended

Fullilove's termination; (g) the sham investigation of Waters' sexual harassment complaint;

(h) her August 25, 2017 through October 29, 2017 administrative leave during investigation for

unspecified charge or incidents; (i) keeping her under Fullilove's supervision; (j) October 16,

2017 notice of proposed suspension for 10 days and violation of due process rights during

investigation; (k) orchestrated attempts to get co-worker(s) to file complaints to discipline her;

and (l) Fullilove intimidating her with his presence and looks.

94.     There is a causal relationship between Plaintiff's protected activities and

Defendants' retaliatory actions against her.

95.     The foregoing retaliation and harassment was severe and pervasive because it has

been ongoing from February, 2017 to the present, and has affected the terms and conditions of

Plaintiff's employment, including causing her to obtain medical and mental health treatment, and

-21-

continuing to work in the constant fear that she will be subjected to further unjustified discipline and ultimately terminated from her employment with DYRS.

96.     Plaintiff believes her work environment to be hostile and abusive, and the series of retaliatory actions to which she has been subjected are objectively hostile and abusive.

97.     At all times Defendants Fullilove and Harllee-Harper were acting within the scope of their employment with Defendant DC.

98.     Defendant DC allowed Fullilove and Harllee-Harper to retaliate against Plaintiff with impunity.

99.     As a direct and proximate result of the foregoing retaliatory actions to which Plaintiff was subjected because of her protected activities, she suffered physical and emotional injuries, economic and non-economic losses, including lost wages, indignity, humiliation, embarrassment, and emotional distress.

WHEREFORE, Plaintiff prays that this Court enter judgment in her favor and against defendants, jointly and severally, as follows:

(a)   award Plaintiff compensatory damages in an amount in excess of  $2.5 million;

(b)   award Plaintiff punitive damages in an amount in excess of $2.5 million against Defendants Fullilove and Harllee-Harper;

(c)   award Plaintiff statutory attorney's fees and costs incurred in bringing and maintaining this claim; and

(d)   award Plaintiff such other and further relief as the interest of justice may require.

-22-

**Count IV**
**Violation of Section 1983 – Sexual Harassment (Fullilove and Harllee-Harper Only)**

100.    Plaintiff restates the allegations set forth in paragraphs 9-70 as if they were fully stated herein.

101.    Plaintiff is a member of a protected class by virtue of her sex (female).

102.    As high level supervisors at DYRS Defendants Fullilove and Harllee-Harper know that sexual harassment is unlawful under the laws of the United States and the District of Columbia.

103.    Nevertheless, Defendant Fullilove subjected Plaintiff to unwelcome sexual harassment for over a year as set forth in the preceding paragraphs, including when Defendant Fullilove:  (a)  touched her breasts, thigh and other areas of her body; (b) requested sexual favors and acts from her; (c) attempted to have sex with her in his office; (d) ordered her to his office routinely to spend hours engaged in inappropriate sexual conduct; (e) promised her and her sister promotions to Grade 9, allowed her to use YSC office for union activities and exempted her from mandatory overtime work; (f) made inappropriate comments about her appearance and ordered her to wear specific underwear to work; (g) communicated with her about sexual matters at work and after hours; (h) exposed his genitals to her; (i) required her to expose herself to him; and (j) threatened to take back privileges of union office at YSC and exemption from mandatory overtime work, and to renege on promised promotions.

104.    Defendant Harllee-Harper aided and abetted the sexual harassment because she knew Fullilove was sexually harassing Waters but did nothing to stop him.  Even after Waters

-23-

filed her sexual harassment complaint, Harllee-Harper refused to take any disciplinary action against Fullilove.

105.    The harassment was based on Plaintiff's membership in a protected class because it focused on her being female, and Defendants have not treated Plaintiff's male co-workers in like fashion.

106.    The harassment was severe and pervasive because it affected Plaintiff's ability to function at work, causing her to be uncomfortable in the workplace, with feelings of physical and emotional debilitation, and ultimately fear that Defendants would fire her and/or physically harm her.

107.    Plaintiff believed her work environment to be hostile and/or abusive, and the series of incidents to which she was subjected are objectively hostile and/or abusive.

108.    Defendants Fullilove and Harllee-Harper were acting under color of law and within the scope of their employment with Defendant DC.

109.  Defendants' discriminatory treatment of Plaintiff based on her gender constitutes a violation of her rights under the DCHRA, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* and the Due Process Clause of the Fifth Amendment to the United States Constitution, actionable under 42 U.S.C. § 1983.

110.    As a direct and proximate result of this hostile work environment to which Plaintiff was subjected because of her gender, she suffered physical and emotional injuries, economic and non-economic losses, including lost wages, indignity, humiliation, embarrassment, and emotional distress.

-24-

WHEREFORE, Plaintiff prays that this Court enter judgment in her favor and against

Defendants Fullilove and Harllee-Harper, jointly and severally, as follows:

(a)  award Plaintiff compensatory damages in an amount in excess of  $2.5 million;

(b) award Plaintiff punitive damages in an amount in excess of $ 2.5 million;

(c)  award Plaintiff statutory attorney's fees and costs incurred in bringing and

maintaining this claim; and

(d)  award Plaintiff such other and further relief as the interest of justice may

require.

### Count IV
### Violation of Section 1983 – Retaliation (Fullilove and Harlee-Harper Only)

111.    Plaintiff restates the allegations set forth in paragraphs 9-70 as if they were fully

stated herein.

112.    As high level supervisors at DYRS Defendants know that retaliation for an

employee's complaint about sexual harassment is unlawful under the laws of the United States

and the District of Columbia.

113.    Plaintiff engaged in statutorily protected activity when she filed complaints of

sexual harassment with OHR and DYRS on February 2, 2017 and February 3, 2017,

respectively, as well as her participation in the resulting investigations.

114.    As a direct and proximate cause of Plaintiff's protected activities Defendants,

subjected her to adverse action(s) and a pattern of retaliatory harassment as set forth in the

preceding paragraphs from February 2017 through the present, including, but not limited to:  (a)

3 days suspension for spending time in Fullilove's office while he sexually harassed her; (b)

-25-

February 23, 2017 proposed 10-day suspension for alleged false statements; (c) April 6, 2017

Official Reprimand; (d) Harllee-Harper's February 21, 2017 statement in roll call that she had

"mixed feelings' about the investigation of Waters' sexual harassment complaint; (e) termination

of Waters' co-worker who corroborated incidents of Fullilove's sexual harassment of her;

(f) Harllee-Harper's intimidation of senior staff who recommended Fullilove's termination; (g)

the sham investigation of Waters' sexual harassment complaint; (h) her August 25, 2017 through

October 29, 2017 administrative leave during investigation for unspecified charge or incidents;

(i) keeping her under Fullilove's supervision; (j) October 16, 2017 notice of proposed suspension

for 10 days and violation of due process rights during investigation; (k) orchestrated attempts to

get co-worker(s) to file complaints to discipline her; and (l) Fullilove intimidating her with his

presence and looks.

115.    There is a causal relationship between Plaintiff's protected activities and

Defendants' retaliatory actions against her.

116.    The foregoing retaliation and harassment was severe and pervasive because it has

been ongoing from February, 2017 to the present, and has affected the terms and conditions of

Plaintiff's employment, including causing her to obtain medical and mental health treatment, and

continuing to work in the constant fear that she will be subjected to further unjustified discipline

and ultimately terminated from her employment with DYRS.

117.    Plaintiff believes her work environment to be hostile and abusive, and the series

of retaliatory actions to which she has been subjected are objectively hostile and abusive.

-26-

118.    At all times Defendants Fullilove and Harllee-Harper were acting under color of law and within the scope of their employment with Defendant DC.

119.    Defendants' retaliatory treatment of Plaintiff based on her protected activities constitutes a violation of her rights under the DCHRA, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* and the Due Process Clause of the Fifth Amendment to the United States Constitution, actionable under 42 U.S.C. § 1983.

120.    As a direct and proximate result of the foregoing retaliatory actions to which Plaintiff was subjected because of her protected activities, she suffered physical and emotional injuries, economic and non-economic losses, including lost wages, indignity, humiliation, embarrassment, and emotional distress.

WHEREFORE, Plaintiff prays that this Court enter judgment in her favor and against Defendants Fullilove and Harllee-Harper, jointly and severally, as follows:

(a)  award Plaintiff compensatory damages in an amount in excess of  $2.5 million;

(b)  award Plaintiff punitive damages in an amount in excess of $2.5 million against Defendants Fullilove and Harllee-Harper;

(c)   award Plaintiff statutory attorney's fees and costs incurred in bringing and maintaining this claim; and

(d)  award Plaintiff such other and further relief as the interest of justice may require.

## **Jury Demand**

Plaintiff demands a trial by jury on all counts of this Complaint.

-27

Respectfully submitted,

*/s/  Jeanett P. Henry*
Jeanett P. Henry, Bar No. 411052
8403 Colesville Road
Suite 1100
Silver Spring, MD 20910
(301) 562-1340
(240) 638-2701 (fax)
Email:  jhenry2085@aol.com

**Attorney for Plaintiff**


CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of November, 2018 I served a copy of this
Amended Complaint by electronic mail on Defendant, District of Columbia's as follows:

Charles J. Coughlin, Esquire
Assistant Attorney General
Civil Litigation Division, Section I
Office of the Attorney General for the District of Columbia
441 4th Street, NW; Suite 630 South
Washington, D.C. 20001
Email:  Charles.coughlin@dc.gov

*/s/  Jeanett P. Henry*
Jeanett P. Henry