## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| KIM WATERS, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 18-2652 (ABJ) |
| DISTRICT OF COLUMBIA, *et al.*, | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

On October 3, 2018, plaintiff Kim Waters brought this action in the Superior Court of the District of Columbia, arising out of her employment at the Department of Youth Rehabilitation Services between 2016 and 2018.  She sued the District of Columbia, Willie Fullilove, and Linda Harllee Harper, Ex. 1 to Notice of Removal [Dkt. # 1-1] at 11, and on September 17, 2019, she amended her complaint to include defendant Lennie V. Moore.  *See* Second Am. Compl. [Dkt. # 26] ¶ 9.[1]

Waters alleges that her supervisor, Fullilove, subjected her to sexual harassment in the workplace based on her gender, Compl. ¶¶ 94, 124, offering to promote her in exchange for sexual favors and threatening to demote her or punish her in other ways if she failed to comply. Compl. ¶¶ 107–08, 114, 135.  She alleges that Fullilove's supervisor, Harllee Harper, knew about the harassment, but did not act to end it or discipline Fullilove, Compl. ¶¶ 95, 125, and that she later retaliated against her for making a complaint.  Compl. ¶¶ 114, 135.  Plaintiff also claims that

---

1    Waters amended her complaint again on July 13, 2020 to add a claim.  See Third Am. Compl. [Dkt. # 45] ("Compl.").

she was subjected to retaliation by the District of Columbia and Moore.  *See* Compl. ¶¶ 112–20;

132–47.  The complaint consists of six counts:

- Count I, against the District of Columbia, Fullilove, and Harllee Harper alleges a hostile work environment in violation of the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401–1403 (2001).  *See* Compl. ¶¶ 92–101.

- Count II, against the District of Columbia and Fullilove alleges quid pro quo harassment in violation of the DCHRA.  *See* Compl. ¶¶ 102–11.

- Count III, against all defendants alleges retaliation in violation of the DCHRA. *See* Compl. ¶¶ 112–20.

- Count IV, brought under 42 U.S.C. § 1983, against Fullilove and Harllee Harper alleges a hostile work environment in violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution.  *See* Compl. ¶¶ 121–31.

- Count V, against Fullilove, Harllee Harper, and Moore alleges retaliation in violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution under section 1983.  *See* Compl. ¶¶ 132–41.

- Count VI, against the District of Columbia alleges retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.  *See* Compl. ¶¶ 142–47.

There are multiple dispositive motions pending before the Court: a motion for summary

judgment filed by the District of Columbia ("District"), Fullilove, and Harllee Harper, Defs.

District, Fullilove, and Harllee Harper Mot. for Summ. J. [Dkt. # 50] ("Mot."); plaintiff's cross

motion for summary judgment, Pl.'s Cross Mot. for Summ. J. [Dkt. # 60] ("Cross Mot."); and

Moore's motion for judgment on the pleadings and for summary judgment.  Def. Moore's Mot.

for J. on the Pleadings [Dkt. # 51] ("Moore's Mot.").  Defendants have also moved to strike a

declaration plaintiff submitted in support of her motion.  Defs. District, Fullilove, Harllee Harper,

and Moore's Mot. to Strike [Dkt. # 68] ("Mot. to Strike").  All of the motions are fully briefed.[2]

---

2       *See* Pl.'s Opp. to Mot. [Dkt. # 56] ("Opp."); Pl.'s Mem. in Opp. to Moore's Mot. [Dkt. # 58] ("Opp. to Moore's Mot."); Def. Moore's Reply to Pl.'s Opp. to Moore's Mot. [Dkt. # 64] ("Moore's Reply"); Defs. District, Fullilove, and Harllee Harper's Mem. in Opp. to Cross Mot.

The case involves completely inappropriate conduct on the part of Waters's supervisor, Fullilove.  But the record also contains undisputed evidence that Waters encouraged Fullilove's advances for a period of time, and that management took swift action as soon as Waters complained about what was going on.  For the reasons to be set forth in more detail below, then, the motion for summary judgment filed by the District, Fullilove, and Harllee Harper will be **GRANTED**.  While the hostile work environment claim against Fullilove himself (Counts I and IV) will stand, the Court will enter judgment in favor of the District on Counts I, II, III, and VI; in favor of Fullilove on Counts II, III, and V; and in favor of Harllee Harper on Counts I, III, IV, and V.  Plaintiff's cross-motion for summary judgment on Counts I, III, IV, V, and VI will be **DENIED**.  The motion filed by Moore will also be **GRANTED**, and the Court will enter judgment in favor of Moore on Counts III and V.  Finally, the motion to strike plaintiff's declaration filed by the District, Fullilove, Harllee Harper, and Moore will be **DENIED AS MOOT**.

---

[Dkt. # 65] ("Defs.' Opp. to Cross Mot."); Defs. District, Fullilove, and Harllee Harper's Reply to Opp. [Dkt. # 66] ("Defs.' Reply"); Pl.'s Reply to Opp. to Cross. Mot. [Dkt. # 67] ("Pl.'s Cross Reply"); Pl.'s Mem. in Opp. to Mot. to Strike [Dkt. # 69] ("Pl.'s Opp. to Mot. to Strike"); Defs. District, Fullilove, Harllee Harper, and Moore's Reply to Pl.'s Opp. to Mot. to Strike [Dkt. # 71].

# BACKGROUND

At all relevant times, Kim Waters has been employed by the District's Department of

Youth and Rehabilitation Services ("DYRS") as a Youth Development Representative. Defs.'

SOF ¶ 1; Pl.'s Resp. to Defs.' SOF ¶ 1.[3]

Willie Fullilove supervised Waters, Defs.' SOF ¶ 2; Pl.'s Resp. to Defs.' SOF ¶ 2, and

Linda Harllee Harper supervised Fullilove. Defs.' SOF ¶ 3; Pl.'s Resp. to Defs.' SOF ¶ 3. Waters

worked at DYRS's Youth Services Center facility, which is also where Fullilove was located. *See*

Defs.' SOF ¶¶ 5, 7; Pl.'s Resp. to Defs.' SOF ¶¶ 5, 7. Lennie Moore served as a DYRS Human

Resources Officer. *See* Ex. 16 to Opp., Letter from Lennie Moore to Kim Waters (June 21, 2019)

[Dkt. # 56-16] ("Ex. 16 to Opp.").

## I. **Sexual Harassment Claims**

Beginning in approximately August 2015, Waters asserts, Fullilove began greeting her with

a hug every day. Ex. A to Mot., Pl.'s Answers to Defs.' First Set of Interrogs. [Dkt. # 50-1] ("Pl.'s

---

3       Defendants the District, Harllee Harper, and Fullilove submitted a statement of material facts – as to which they contend there is no genuine issue – in support of their motion for summary judgment. *See* Mot., Statement of Undisputed Material Facts ("Defs.' SOF") ¶¶ 1–81. Plaintiff filed a response, as well as a statement of material facts, Opp., Pl.'s Resp. to Defs.' SOF ("Pl.'s Resp. to Defs.' SOF"); Opp., Pl.'s Statement of Material Undisputed Facts ("Pl.'s SOF"), and the District, Harllee Harper, and Fullilove filed a reply. Defs.' Reply, Resps. to Pl.'s Resp. to Defs.' SOF [Dkt. # 66-1] ("Defs.' Resp. to Pl.'s SOF").

Defendant Moore also filed a statement of undisputed material facts. Moore's Mot., Def. Moore's Statement of Undisputed Material Facts ("Moore's SOF"). Plaintiff filed a response, as well as a statement of material facts, Opp. to Moore's Mot., Pl.'s Reply to Moore's SOF ("Pl.'s Resp. to Moore's SOF"); Opp. to Moore's Mot., Pl.'s SOF ("Pl.'s SOF Pertaining to Moore"), and Moore filed a reply. Moore's Reply, Def. Moore's Reply to Pl.'s Resp. to Moore's SOF ("Moore's Resp. to Pl.'s SOF").

Pursuant to Local Civil Rule 7(h)(1), "[i]n determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."

Answers to Interrog.") at 4. Plaintiff asserts that by January 2016, Fullilove's "hugs became sexualized, grabbing, and pulling [her] 'full-frontal' into his body, as [she] struggled to pull away from him or smack his hands away [from her]" – behavior that continued through January 2017. *Id.* In February 2016, Waters says, Fullilove began commenting on her clothing and general appearance. *Id.* at 5. Waters alleges that in April 2016, in front of the Youth Services Center facility, Fullilove instructed her to get into his car, and that he touched Waters's breast and leg and called attention to his erection after driving away. *Id.* She asserts that this sort of behavior continued: between January 2016 and January 2017, Fullilove ordered her into his office "almost daily," and "engaged [her] in sexually inappropriate conversations," "rub[bed] [her] thigh and breasts," "gyrate[d] on [her]," exposed himself, and requested sexual intercourse. *Id.* Waters also claims that between February 2016 and January 2017, Fullilove "routinely called and texted" her and engaged in sexually inappropriate conversations. *Id.* at 6. Around January 2017, Waters began "experiencing chest pains, shortness of breath, and numbness in [her] hands" resulting from the "stress and anxiety of Fullilove's sexual harassment," which forced her to "seek emergency medical treatment." *Id.* at 6–7.

Defendants produced evidence to show that Waters was an active participant in these exchanges with Fullilove. Defs.' SOF ¶¶ 13–14; Pl.'s Resp. to Defs.' SOF ¶¶ 13–14. Beginning in 2015, Waters sent Fullilove text messages on his government cell phone on weekends and after work hours, including messages with a "'kissy face' emoji, an emoji with hearts for eyes, and a 'bitmoji' winking that said 'I LIKE YOU!,'" as well as statements that she liked the way he placed his lips on a bottle during a meeting and complimenting his appearance in a suit. Defs.' SOF ¶¶ 13–14; Pl.'s Resp. to Defs.' SOF ¶¶ 13–14; Ex. C to Mot., Defs.' Excerpts of Pl.'s Apr. 3, 2019 Dep. [Dkt. # 50-1] ("Ex. C to Mot.") at 131:5–132:1. Waters also sent Fullilove

photographs of herself in pajama shorts, a tank top, and her underwear.  Ex. C to Mot. at 131:17–132:1.  She asserts that she sent these messages "out of fear that if she did not make him feel good her job would be at risk."  Pl.'s Resp. to Defs.' SOF ¶ 14.  "Any time I rebuffed Fullilove's sexually inappropriate comments and/or conduct he threatened to take back the union office,[4] put me back on the draft where I would have to work overtime, and not promote me to Grade 9."  Pl.'s Answers to Interrog. at 7.  Waters also feared Fullilove would endeavor to fire her if she did not comply with his advances.  Defs.' SOF ¶ 15; Pl.'s Resp. to Defs.' SOF ¶ 15.

Waters asserts that Harllee Harper, Fullilove's supervisor, was aware of his inappropriate behavior because, during several meetings, "Harllee-Harper observed Fullilove invading Waters' personal space, hugging her, and engaging in other inappropriate touching, as Waters leaned away, or tried to pull or get away from his presence."  Compl. ¶ 41; *see also* Pl.'s Answers to Interrog. at 7; Defs.' SOF ¶ 21; Pl.'s Resp. to Defs.' SOF ¶ 21.[5]

The agency's sexual harassment policy advises any employee who believes they are being subjected to sexual harassment that they "should immediately take action" by filing a complaint with a DYRS supervisor or manager, a DYRS Equal Employment Opportunity ("EEO") Officer, the District's Office of Human Rights ("OHR"), or the Equal Employment Opportunity Commission ("EEOC").  Ex. E to Mot., DYRS Policy and Procedures Manual, Sexual Harassment in the Workplace [Dkt. # 50-1] ("Sexual Harassment Policy") at 4.  Any supervisor or manager who is informed about a sexual harassment allegation is bound to report the allegation to a DYRS

---

[4]    Fullilove allowed Waters to use an office for union business.  *See* Ex. C to Mot. at 224:7–224:20.

[5]    Defendants deny that Harllee Harper observed or had knowledge of the conduct plaintiff describes; they submit that Harllee Harper did not become aware of plaintiff's allegations until she filed the sexual harassment complaint.  Defs.' SOF ¶ 22; Ex. F to Mot., Harllee Harper's Resps. to Pl.'s First Set of Interrogs. [Dkt. # 50-1] at 5; *see also* Pl.'s Resp. to Defs.' SOF ¶ 22.

EEO Officer and the alleged harasser's supervisor, and to notify the harasser of the allegation and to stop the alleged conduct. *Id.* at 4–5. Then, the EEO Officer is directed to "promptly initiate investigations" of the allegations. *Id.* at 5.[6]

Waters filed a sexual harassment complaint with OHR on February 2, 2017. *See* Defs.' SOF ¶ 23; Pl.'s Resp. to Defs.' SOF ¶ 23. She also filed a sexual harassment complaint on February 3, 2017 to the DYRS Department of Human Resources, which transmitted the complaint to the District's Department of Human Resources ("DCHR"). Defs.' SOF ¶¶ 24–25; Pl.'s Resp. to Defs.' SOF ¶¶ 24–25.

On February 5, 2017, two days after Waters filed her complaint, DYRS transferred her to another facility called "New Beginnings." Defs.' SOF ¶ 28; Pl.'s Resp. to Defs.' SOF ¶ 28; *see also* Pl.'s Answers to Interrog. at 7.[7] The parties agree that, to the extent that Fullilove sexually harassed Waters at all, the alleged behavior stopped after the transfer to New Beginnings. Defs.' SOF ¶ 28; Pl.'s Resp. to Defs.' SOF ¶ 28. However, Waters asserts that within the first two weeks of her transfer, Fullilove visited New Beginnings "approximately three times and made sure that [she] saw him," in an effort to intimidate her. Pl.'s Answers to Interrog. at 7. Waters notified DCHR about Fullilove's visits, and he was then placed on administrative leave. Defs. SOF ¶ 32; Pl.'s Resp. to Defs.' SOF ¶ 32. Fullilove remained on administrative leave for approximately four

---

6    In 2008, Waters filed an unrelated sexual harassment complaint involving DYRS. Defs.' SOF ¶ 75; Pl.'s Resp. to Defs.' SOF ¶ 75.

7    When deposed, Waters stated she was transferred to New Beginnings at the end of January 2017, but she agreed with defendants' statement of material facts that her transfer occurred in February 2017. *Compare* Ex. C to Mot. at 160:16–160:18 (transfer occurred January 2017) *with* Pl.'s Resp. to Defs.' SOF ¶ 28 (transfer occurred February 5, 2017) *and* Pl.'s Answers to Interrog. at 7 (transfer occurred days after February 3, 2017).

and a half months.  Ex. G to Mot., Defs.' Excerpts of Dep. of Willie Fullilove [Dkt. # 50-1] at 39–

40; *see also* Ex. C to Mot. at 238:8–238:15. [8]

## II.    **DCHR's Investigation of Sexual Harassment Claims and Subsequent Disciplinary Action**

On March 29, 2017, DCHR met with DYRS to discuss its investigation into Waters's

complaints and share its findings and recommendations.  Ex. J to Mot., Am. DCHR Investigation

Report [Dkt. # 50-1] ("DCHR Report").  On May 15, 2017, DCHR issued its final Investigation

Report,[9] *see id.*, concluding that:

- Waters and Fullilove engaged in a "consensual relationship while both employees were on duty and on DYRS premises." *Id.* at 8.

- Fullilove misused his government-issued phone when he communicated with Waters in a personal manner and failed to report inappropriate messages from Waters. *Id.* at 6.

- Fullilove engaged in inappropriate off-duty conduct with a subordinate employee. *Id.* at 6.

- Fullilove wasted work time in meetings and in his office when he discussed personal matters and engaged in "horseplay" with Waters. *Id.* at 6–7.

- Waters neglected her work duties by meeting with Fullilove, often for hours at a time and on multiple days a week, to discuss personal matters. *Id.* at 7.

- Waters sent Fullilove inappropriate messages that could be construed as "sexually suggestive." *Id.*

- Waters "participated in a close, personal, and inappropriate relationship with [] Fullilove while in the workplace[,] compromising her dual role as a DYRS employee and union Vice-President." *Id.* at 8.

---

[8]     Waters alleges that, outside of her presence, Harllee Harper stated that she had "mixed feelings" about DCHR's investigation of Waters's sexual harassment complaints.  Defs.' SOF ¶ 27; Pl.'s Resp. to Defs.' SOF ¶ 27.  Harllee Harper does not recall making such a statement. *See* Ex. H to Mot., Defs.' Excerpts of Linda Harllee Harper's Dep. (Apr. 18, 2019) at 65:9–66:16.

[9]     Waters's surname was previously "Bell"; the Report refers to Waters by her former name, Kim Bell.  *See* DCHR Report at 1; *see also* Ex. C to Mot. at 19 (mentioning marriage to Roger Bell).

- Waters stated to investigators that she "engaged in a relationship in exchange for being promoted to a [G]rade 9 [position],[10] however [the] investigation revealed that no such promise, direct or implied, was made." *Id.* at 8.

DCHR recommended that, if DYRS determined Fullilove had the requisite skills to continue in his current role, it should suspend him for ten days and encourage him to take management skill development courses. DCHR Report at 9. DCHR recommended an eight-day suspension for Waters and a stress management course. *Id.* at 8. It added that if OHR determined that Waters fabricated her allegations against Fullilove, DYRS should consider her removal. *Id.*[11]

On July 18, 2017, Waters received an "Advance Written Notice of Proposed Suspension of Three (3) Days" based on the findings outlined in the DCHR Report. *See* Ex. S to Mot., Letter from Linda Harllee Harper to Kim Waters (Aug. 9, 2017) [Dkt. # 50-1] ("Ex S to Mot.") at 1; *see also* DCHR Report at 8. Waters contested the proposed suspension on July 28, 2017 through her union representative. *See* Ex. S to Mot. at 1. On August 9, 2017, Waters received a "Final Decision Notice," suspending her from her position as a Youth Development Representative for three days from August 14 to August 16, 2017.[12] *Id.* at 2. The Notice was signed by Harllee Harper, who was listed as the "Deciding Official." *Id.*

Fullilove was also suspended.[13] Defs.' SOF ¶ 40; Pl.'s Resp. to Defs.' SOF ¶ 40.

---

10    Waters says she did not apply for a Grade 9 promotion because by the time the promotions became available, "[she] was actively involved in her lawsuit." Pl.'s Resp. to Defs.' SOF ¶ 17.

11    The parties have not submitted the OHR investigative report to the Court.

12    Following her suspension, Waters was reassigned to another DYRS location called the "Achievement Center" or "MLK." Defs.' SOF ¶ 42; Pl.'s Resp. to Defs.' SOF ¶ 42; Pl.'s Answers to Interrog. at 8.

13    In his deposition, Fullilove testified he could not recall exactly how long his suspension lasted, guessing it spanned "a couple days." Ex. G to Mot., Defs.' Excerpts of Dep. of Willie Fullilove at 39:15–40:2.

III.   **Discipline Involving Other Workplace Conduct**

During and after the period Fullilove was allegedly subjecting Waters to harassment in the workplace, Waters was disciplined for incidents arising out of conflicts with other DYRS employees and for marijuana use.

a.   *Car Incident*

On December 15, 2016, Waters filed a complaint with DYRS alleging that a DYRS program assistant, Caroline Wilborn, attempted to hit her with a moving car in the agency parking lot.  Ex. 5 to Opp., Staff Incident Notification Form [Dkt. # 56-5]; Defs.' SOF ¶ 76; Pl.'s Resp. to Defs.' SOF ¶ 76; Ex. C to Mot. at 105:20–110:16.  DYRS representatives reviewed video footage of the incident and determined that Wilborn did not attempt to hit Waters with her car.  Defs.' SOF ¶ 78; Pl.'s Resp. to Defs.' SOF ¶ 78.  On December 22, 2016, Adam Aljoburi, the DYRS Chief of Staff, informed Waters's union representative, Timothy Traylor, that discipline would be forthcoming in response to her submission of a false statement.  Defs.' SOF ¶ 79, citing Ex. Q to Mot., Letter from Adam Aljoburi to Kim Waters (Apr. 6, 2017) [Dkt. # 50-1] ("Ex. Q to Mot.") at 2.  Plaintiff identified this statement as disputed in her response, Pl.'s Resp. to Defs.' SOF ¶ 79, but did not cite to any evidence in the record that creates the dispute.

On February 24, 2017, Waters received an "Advance Written Notice of Proposed Suspension," which proposed to suspend her for ten days based on the alleged false statements in the report.  *See* Ex. Q to Mot. at 1.  Waters responded to the proposed suspension on March 1, 2017. *Id.*  She challenged the suspension with the assistance of the union, claiming it was proposed as "blatant retaliation" for the sexual harassment claims she lodged against Fullilove in February of 2017.  *Id.* at 2.

10

On April 6, 2017, Adam Aljoburi, DYRS's Chief of Staff and the "Deciding Official" in the matter, decided to reduce the proposed disciplinary action from a suspension to an official reprimand. *Id.* at 1. In the "Final Decision" letter to Waters, Aljoburi wrote that he "was not aware of any alleged discrimination nor any impending EEO complaints from [Waters] against a DYRS manager at the time I told Chairperson Phillips that this incident would lead to discipline," which was December 22, 2016. *Id.* at 2.

Waters filed a grievance contesting the official reprimand, but she states that she did not hear anything further. Pl.'s Answers to Interrog. at 9.

   b.   *Inappropriate Comments*

On August 25, 2017, Waters received another letter from Adam Aljoburi at DYRS informing her that she was "being placed on [paid] administrative leave while an investigation [was] being conducted." Ex. 6 to Opp., Letter from Adam Aljoburi to Kim Waters (Aug. 25, 2017) [Dkt. # 56-6] ("Ex. 6 to Opp.") at 1; Pl.'s SOF ¶ 8; Defs.' Resp. to Pl.'s SOF ¶ 8. Aljoburi did not specify the nature of the investigation in his letter. *See* Ex. 6 to Opp. Waters's union representative inquired about the reason for the administrative leave, but he received no response. Pl.'s SOF ¶ 9.[14]

About two months later, on October 12, 2017, Krista Scalise, DYRS's Deputy Director of Operations, sent Waters an "Advance Written Notice of Proposed Suspension of Ten (10) Days," Ex. 8 to Opp., Letter from Krista Scalise to Kim Waters (Oct. 12, 2017) [Dkt. # 57] (SEALED), based on three sets of comments Waters was alleged to have made:

▪   July 18, 2017: When Waters received the notice of proposed suspension following DCHR's investigation into her sexual harassment claims, she allegedly asked the New Beginnings

---

14   Defendants contest whether her union representative inquired about the reasons for the administrative leave and investigation, saying that this statement is "unsupported by the record." Defs.' Resp. to Pl.'s SOF ¶ 9.

Deputy Superintendent Mark Hamlett "how he would feel if his daughter was molested." *Id.* at 1.  Waters then said she hoped Linda Harllee Harper, who was listed as the "Deciding Official" on the notice, "rots in hell."  *Id.*

▪ August 17, 2017: Waters approached a program support specialist named Dennis Lewis and told him to "stop fake shit," not to speak with her, and that there was "a place in hell" for him.  *Id.* at 1–2.

▪ August 24, 2017: During a meeting, Waters "had an outburst" in which she said a youth "felt it was appropriate to act sexually inappropriate because [DYRS] upper management engages in such a manner."  *Id.* at 2.

Two weeks later, Waters and her union representative met with DYRS HR representatives. Pl.'s SOF ¶ 11; Defs.' Resp. to Pl.'s SOF ¶ 11.   The HR officials rescinded the proposed suspension.  *Id.*  Waters returned to work at the Achievement Center facility on October 30, 2017.[15] Pl.'s Answers to Interrog. at 8.  Waters notes that at that time, she feared going to work at this location because she worried about coming into contact with a youth who was the subject of a stay away order.  *Id.*  In December 2017, Harllee Harper transferred her back to the Youth Services Center facility.  *Id.* at 9.

c. *Marijuana Use*

On May 21, 2019, Waters was randomly selected for a drug test and tested positive for marijuana use.  Defs.' SOF ¶ 58; Pl.'s Resp. to Defs.' SOF ¶ 58; Moore's SOF ¶¶ 6–10; Pl.'s Resp. to Moore's SOF ¶¶ 6–10.  District policy excuses positive tests if the employees involved are also enrolled in a medical marijuana program.  Ex. 2 to Opp., DCHR Personnel Manual Instruction No. 4-34 [Dkt. # 56-2] ("DPM Instruction No. 4-34") at 3; Pl.'s SOF ¶ 19; Defs.' Resp. to Pl.'s SOF ¶ 19.  After Waters tested positive, DCHR checked to determine whether she had a valid medical marijuana card on file.  Ex. M to Mot., Defs.' Excerpts of Absala Mengestab's Dep. [Dkt. # 50-1] ("Ex. M to Mot.") at 38; Defs.' SOF ¶ 59; Pl.'s Resp. to Defs.' SOF ¶ 59.

---

15    Waters also refers to this facility as "MLK."  *See* Ex. C to Mot. at 66:7–66:14.

Although Waters was a previous participant in Maryland's medical marijuana program, her medical marijuana card had expired on May 8, 2019 – thirteen days before the drug test. Ex. 11 to Opp., Patient Identification Card [Dkt. # 59-1] (SEALED) ("Patient ID Card"). Waters was issued another medical marijuana card on May 24, 2019 – three days after the test. Patient ID Card. Although her card had expired, Waters asserts now that she had received a written certification which stated that she qualified for the medical marijuana program on September 14, 2018 and through June 16, 2019. Pl.'s SOF Pertaining to Moore ¶ 10; Ex. 29 to Opp. to Moore's Mot. [Dkt. # 57-1].[16]

On May 29, 2019, DCHR Compliance emailed a number of DCHR employees, including Lennie Moore, informing them that Waters had tested positive for marijuana and asking whether she had "provided any medical documentation that might explain the positive test result." Ex. 15 to Opp., Email from DCHR Compliance to DCHR Individuals (May 29, 2019) [Dkt. # 56-15]; *see* Pl.'s SOF ¶ 17; Defs.' Resp. to Pl.'s SOF ¶ 17.

The following month, DCHR sent Waters an "Advance Written Notice of Removal." *See* Ex. 16 to Opp. On June 21, 2019, Lennie Moore informed Waters that she was being placed on paid administrative leave pending a final decision on her removal. *Id.* Waters asserts – and Moore disputes – that Moore knew she was enrolled in a medical marijuana program; that she explained to him the difference between having a medical marijuana card – which, according to her, would have allowed her to purchase medical marijuana – and being "certified" as a participant in the program; and that Moore assured her "several times" that "everything would be 'fine,'" and she

---

16      The "written certification" had an expiration date of September 14, 2019. Ex. 29 to Opp. to Moore's Mot. In May 2019, though, the Maryland Medical Cannabis Commission told Waters that her patient registration would expire on June 16, 2019. Ex. 5 to Opp. to Moore's Mot. [Dkt. # 58-5].

would be able to return to work soon.   Compl. ¶¶ 76, 79; *see also* Pl.'s SOF Pertaining to

Moore ¶¶ 9, 16–18; Moore's Resp. to Pl.'s SOF ¶¶ 16–18.

Justin Zimmerman, the Associate Director of Policy and Compliance Administration at

DCHR, reviewed the June 21, 2019 notice, as well as a report and recommendation issued by an

administrative review officer.   Ex. 18 to Opp., Letter from Justin Zimmerman to Kim Waters

(Aug. 1, 2019) [Dkt. # 61-1] (SEALED) ("Termination Letter from Zimmerman").   After his

review, Zimmerman decided to terminate Waters's employment effective August 9, 2019, due to

the positive marijuana test.   *Id.*; Pl.'s SOF ¶ 24; Defs.' Response to Pl.'s SOF ¶ 24.

Waters challenged her termination three times:

- On August 15, 2019, Waters filed a grievance through her union representative challenging the termination and presenting evidence of her participation in the Maryland medical marijuana program.   Ex. 19 to Opp., Letter from Andre Phillips to Trey Stanback and Justin Zimmerman [Dkt. # 56-19] ("Pl.'s Grievance"); Pl.'s SOF ¶ 25; Defs.' Resp. to Pl.'s SOF ¶ 25.   Zimmerman denied the grievance, concluding there was "proper cause for Ms. Waters' separation."   Ex. 20 to Opp., Letter from Justin Zimmerman to Andre Phillips (Sept. 2, 2019) [Dkt. # 56-20] at 3 ("Grievance Denial"); Pl.'s SOF ¶ 26; Defs.' Resp. to Pl.'s SOF ¶ 26.

- Waters then filed a grievance with the DYRS Director, Clinton Lacey.   Pl.'s Answers to Def. Moore's First. Set of Interrogs. [Dkt. # 51-1] at 5–6; Defs.' SOF ¶ 67; Pl.'s Resp. to Defs.' SOF ¶ 67.   Lacey also denied the grievance.   Defs.' SOF ¶ 68; Pl.'s Resp. to Defs.' SOF ¶ 68.

- Finally, through arbitration, Waters's termination was overturned.   Ex. 3 to Opp., Arbitration Opinion [Dkt. # 56-3] ("Arbitration Op.").   The arbitrator found that "the Agency did not have just cause to terminate Kim Wa[t]ers due to her positive marijuana test result" because she was a registered medical marijuana patient and was enrolled in a valid medical marijuana program in Maryland on the day she tested positive for marijuana. *Id.* at 10–11.

Waters returned to work at DYRS thereafter.   Defs.' SOF ¶ 70; Pl.'s Resp. to Defs.'

SOF ¶ 70.

## STANDARD OF REVIEW

I.   **Motion for Summary Judgment**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation.  *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

"The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion."  *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989) (alteration in original), quoting *McKenzie v. Sawyer*,

684 F.2d 62, 68 n.3 (D.C. Cir. 1982).  In assessing each party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party."  *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.

## II.   Motion for Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) authorizes a party to move for judgment on the pleadings "after the pleadings are closed."  Fed. R. Civ. P. 12(c).[17]  Parties are entitled to pretrial judgment on the pleadings "if the moving party demonstrates that no material fact is in dispute and that it is entitled to judgment as a matter of law."  *Schuler v. PricewaterhouseCoopers, LLP*, 514 F.3d 1365, 1370 (D.C. Cir. 2008), quoting *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1485 (D.C. Cir. 1992).  When analyzing a motion for judgment on the pleadings, the Court must "view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party."  *Peters*, 966 F.2d at 1485, quoting *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290–91 (3d Cir. 1988); *see Thompson v. District of Columbia*, 428 F.3d 283, 284 (D.C. Cir. 2005) (viewing the complaint's allegations in the light most favorable to the plaintiff when defendants filed a 12(c) motion); *see also Hall v. District of Columbia*, 867 F.3d 138, 152 (D.C. Cir. 2017) ("A Rule 12(c) motion considers the defendants' answers together with the complaint.").  "The moving party must demonstrate its entitlement to judgment in its favor, even though the 'court evaluating the 12(c) motion will accept as true the allegations in the opponent's pleadings, and as false all controverted assertions of the movant.'"

---

17    Pleadings are closed for Rule 12(c) purposes when a complaint and an answer have been filed.  *See* Fed. R. Civ. P. 7(a); *Tapp v. Washington Metro. Area Transit Auth.*, 306 F. Supp. 3d 383, 391 n.6 (D.D.C. 2016) ("Pleadings are closed for Rule 12(c) purposes when a complaint and an answer have been filed."); *Maniaci v. Georgetown Univ.*, 510 F. Supp. 2d 50, 60 (D.D.C. 2007) ("Pleadings are closed within the meaning of Rule 12(c) if no counter or cross claims are at issue when a complaint and an answer have been filed.").

*Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n, AFL-CIO v. Liberty Mar. Corp.*, 933 F.3d 751, 760–61 (D.C. Cir. 2019).

While there are opinions in this district that state that the standards of review for a Rule 12(b)(6) motion and a Rule 12(c) motion are "essentially the same" or "virtually identical," *see, e.g.*, *Nat'l Shopmen Pension Fund v. Disa*, 583 F. Supp. 2d 95, 99 (D.D.C. 2008), citing *Plain v. AT&T Corp.*, 424 F. Supp. 2d 11, 20 n.11 (D.D.C. 2006); *Maniaci*, 510 F. Supp. at 58; *Jung v. Ass'n of Am. Med. Colls.*, 339 F. Supp. 2d 26, 35–36 (D.D.C. 2004), the standard set out in the *Schuler* case by the D.C. Circuit more closely resembles a summary judgment type of determination.

Wright's Federal Practice and Procedure makes the same observation, noting that a Rule 12(c) motion asks a court to address the merits of the parties' claims and defenses and not simply procedural barriers or pleading deficiencies.  5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1369 (3d ed. 2017) (commenting that the appropriate standard of review for a Rule 12(c) motion is more similar to a Rule 56 motion for summary judgment, except that the court may only consider the contents of the pleadings); *see also Jones v. Dufek*, 830 F.3d 523, 528 (D.C. Cir. 2016) ("The district court properly resolved these questions as a matter of law on a motion under Rule 12(c)."), citing *Alexander v. City of Chicago*,

994 F.2d 333, 336 (7th Cir. 1993) ("[T]he standard courts apply for summary judgment and for judgment on the pleadings 'appears to be identical.'").[18]

If on a Rule 12(b)(6) or 12(c) motion, "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d); *see Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993) (applying the same test when converting a Rule 12(b)(6) motion to one for summary judgment). But the "parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Liberty Mar. Corp.*, 933 F.3d at 764. The Court has the discretion to decide if it will convert a motion for judgment on the pleadings to one for summary judgment. *See Holy Land Found. For Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003) (noting that the failure to comply with the procedures to convert a motion to dismiss to one for summary judgment is evaluated under an "abuse of discretion" standard); *Hollis v. U.S. Dep't of the Army*, 856 F.2d 1541, 1544 (D.C. Cir. 1988); *Tele-Commc'ns of Key West, Inc. v. United States*, 757 F.2d 1330, 1334 (D.C. Cir. 1985) ("[T]he reviewing court must assure itself that summary judgment treatment would be fair to both parties in that the procedural requirements of the applicable rules were observed."); *Flynn v. Tiede-Zoeller, Inc.*,

---

18      *See also Landmark Am. Ins. Co. v. VO Remarketing Corp.*, 619 F. App'x 705, 708 (10th Cir. 2015) ("Granting a motion for judgment on the pleadings requires the movant to establish an absence of any issue of material fact and entitlement to judgment as a matter of law."); *Poehl v. Countrywide Home Loans, Inc.*, 528 F.3d 1093, 1096 (8th Cir. 2008) ("A grant of judgment on the pleadings is appropriate where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law.") (internal quotation marks omitted); *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 259 (3d Cir. 2008) ("[Rule 12(c)] [j]udgment will only be granted where the moving party clearly establishes there are no material issues of fact, and that he or she is entitled to judgment as a matter of law."); *Nat'l Fid. Life Ins. Co. v. Karaganis*, 811 F.2d 357, 358 (7th Cir. 1987) ("A motion for judgment on the pleadings may be granted only if the moving party clearly establishes that no material issue of fact remains to be resolved and that he or she is entitled to judgment as a matter of law.").

412 F. Supp. 2d 46, 50 (D.D.C. 2006) ("The decision to convert a motion to dismiss into a motion for summary judgement, however, is committed to the sound discretion of the trial court.").

## ANALYSIS

The motion for summary judgment filed by the District, Fullilove, and Harllee Harper will be **GRANTED**.  While the hostile work environment claims against Fullilove (Counts I and IV) will move forward, the Court will enter judgment in favor of the District on Counts I, II, III, and VI; in favor of Fullilove on Counts II, III, and V; and in favor of Harllee Harper on Counts I, III, IV, and V.  Plaintiff's cross-motion for summary judgment on Counts I, III, IV, V, and VI will be **DENIED**.  The motion filed by Moore will be **GRANTED**, and the Court will enter judgment in favor of Moore on Counts III and V.  Finally, the motion to strike plaintiff's declaration filed by the District, Fullilove, Harllee Harper, and Moore will be **DENIED AS MOOT**.

I.   **Count I**: **Hostile Work Environment in Violation of DCHRA against Defendants the District, Fullilove, and Harllee Harper**

The District and Harllee Harper moved for summary judgment on plaintiff's hostile work environment claims against them under the DCHRA.  Mot. at 35–39.  Fullilove did not move for summary judgment on this count, and therefore, that aspect of the claim stands.  *See id.* at 35.  Plaintiff opposes the motion and also cross-moved for summary judgment against the District and Harllee Harper on this claim.  *See* Cross Mot. at 38, 40.

"To prevail on a hostile work environment claim, a plaintiff must first show that he or she was subjected to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013), quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (Title VII case); *see Daka, Inc. v. Breiner*, 711 A.2d 86, 92 (D.C. 1998) (holding that the same test for hostile work environment applies in

Title VII and DCHRA claims).  *See also Purcell v. Thomas*, 928 A.2d 699, 710–11 (D.C. 2007)

("[A] plaintiff establishes a prima facie case of sexual harassment upon demonstrating that

unwelcome verbal and/or physical advances of a sexual nature were directed at him/her in the

workplace, resulting in a hostile or abusive working environment.  And, a plaintiff has a viable

hostile environment claim if [she] can demonstrate (1) that [she] is a member of a protected class,

(2) that [she] has been subjected to unwelcome harassment, (3) that the harassment was based on

membership in the protected class, and (4) that the harassment is severe and pervasive enough to

affect a term, condition, or privilege of employment.") (internal quotation marks and citations

omitted).

To determine whether a work environment is actionable, courts examine all of the

circumstances, which may include the frequency of the discriminatory conduct, its severity,

whether it is physically threatening or humiliating, or merely offensive, and whether it

unreasonably interferes with an employee's work performance; the effect on an employee's

psychological well-being is relevant in determining whether the victim actually found the work

environment to be abusive, but that factor, like any other relevant factor, may be taken into account

and no single factor is required.  *Harris*, 510 U.S. at 23.

A hostile work environment claim has both a subjective and an objective component:

plaintiff must allege facts showing that she subjectively perceived the environment as hostile and

that the environment was one "that a reasonable person would find hostile or abusive." *Harris*,

510 U.S. at 21–22.  Whether the objective standard has been met is considered based on the

"totality of the circumstances." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008); *see*

*also Allen v. Napolitano*, 774 F. Supp. 2d 186, 205–06 (D.D.C. 2011), citing *Holbrook v. Reno*,

196 F.3d 255, 262–63 (D.C. Cir. 1999) (explaining that a defendant's behavior must severely or

pervasively alter and interfere with plaintiff's employment).  Further, it is unlawful for "any person to aid [or] abet" discriminatory conduct under the DCHRA.  *See* D.C. Code §§ 2-1402.62; *see also Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 889 (D.C. 1998) ("Title VII differs from the [DC] Human Rights Act in several critical respects . . . there is no provision in Title VII proscribing 'aiding or abetting.'").

As noted above, Fullilove did not move for judgment on this count, so the claim against him will move forward.

### a.  *Harllee Harper*

Harllee Harper did move for summary judgment on plaintiff's hostile work environment claim under the DCHRA, Mot. at 37, and plaintiff cross-moved for summary judgment against her.  *See* Cross Mot. at 38, 40.  Waters alleged in her complaint that Harllee Harper, was personally liable: she "aided and abetted the sexual harassment because she knew Fullilove was sexually harassing Waters[,] but did nothing to stop him [and] refused to take any disciplinary action against Fullilove." Compl. ¶ 95.  Waters asserts that "Harllee-Harper observed Fullilove invading Waters' personal space, hugging her, and engaging in other inappropriate touching, as Waters leaned away, or tried to pull or get away from his presence."  Compl. ¶ 41.  Harllee Harper disputes that she knew about Fullilove's inappropriate behavior, maintaining that she "did not observe Fullilove sexually harass Waters and did not hear about her allegations until after Waters filed her sexual harassment complaint."  Defs.' SOF ¶ 22.

Because there is a genuine dispute of material fact between the parties as to whether Harllee Harper knew about Fullilove's behavior, plaintiff's motion for summary judgment on Count I against Harllee Harper cannot be granted.

As for Harllee Harper's motion, even if plaintiff has come forward with some evidence to

show that Harllee Harper saw Fullilove hug her or stand next to her, that conduct alone would not

be sufficient to alert a supervisor to the existence of a hostile or abusive environment as it is defined

in this circuit.  Plaintiff does not aver that Harllee Harper was privy to Fullilove's sexual touching

or grabbing, or that she was aware of his pressuring her to engage in sexual activity.  Because

Waters has not come forward with any other evidence that gives rise to a genuine dispute on the

question of whether Harllee Harper was aware that her subordinate was subjecting Waters to a

hostile work environment, the Court will grant the motion for summary judgment as to Harllee

Harper on this count.

      b.  *The District of Columbia*

But there is also the question of the District's liability for Fullilove's alleged misconduct.

The District moved for summary judgment on plaintiff's hostile work environment claims under

the DCHRA, Mot. at 38–39, and plaintiff cross-moved for summary judgment against the District

on Count I.  *See* Cross Mot. at 38, 40.

> An employer is subject to vicarious liability to a victimized employee for
> an actionable hostile environment created by a supervisor with immediate
> (or successively higher) authority over the employee. When no tangible
> employment action is taken, a defending employer may raise an affirmative
> defense to liability or damages . . . .  The defense comprises two necessary
> elements: (a) that the employer exercised reasonable care to prevent and
> correct promptly any sexually harassing behavior, and (b) that the plaintiff
> employee unreasonably failed to take advantage of any preventive or
> corrective opportunities provided by the employer or to avoid harm
> otherwise.

*Faragher v. City of Boca Raton*, 524 U.S. 775, 807–08 (1998). *See also id.* at 778 (listing

"discharge, demotion, or undesirable reassignment" as examples of tangible employment actions).

Waters asserts that the District is vicariously liable for the alleged hostile work

environment because "Fullilove and Harllee-Harper were acting within the scope of their

employment," and the District "allowed Fullilove and Harllee-Harper to sexually harass Waters with impunity."  Compl. ¶¶ 99–100.

In the absence of evidence to suggest that any tangible employment action was an aspect of the alleged hostile environment, the District maintains that the affirmative defense to vicarious liability applies.  It submits that even if Fullilove created a hostile environment, the District exercised reasonable care to prevent sexual harassment because it had a sexual harassment policy in place, and that as soon as Waters put it on notice by filing a complaint, it immediately took action in accordance with the policy to "correct promptly any sexually harassing behavior."  Mot. at 38–39; *see Faragher*, 524 U.S. at 807.  Defendants points to the investigation of plaintiff's complaints, which commenced "[a]s soon as Waters submitted her allegations of sexual harassment," Defs.' SOF ¶ 25; Pl.'s Resp. to Defs.' SOF ¶ 25, to show that it followed its sexual harassment policy.  *See* Sexual Harassment Policy.  The District also immediately separated Waters from Fullilove and placed Fullilove on administrative leave after he visited plaintiff's new facility.  Pl.'s Resp. to Defs.' SOF ¶ 28; Ex. G to Mot., Defs.' Excerpts of Dep. of Willie Fullilove at 39–40; *see also* Ex. C to Mot. at 238:8–238:15.

There is no genuine issue of material fact as to whether the District took reasonable steps to prevent and correct sexual harassment – it had a sexual harassment policy in place, *see* Sexual Harassment Policy, and it took the prescribed steps as soon as Waters filed a sexual harassment complaint.  Defs.' SOF ¶¶ 25, 28; Pl.'s Resp. to Defs.' SOF ¶¶ 25, 28.  Plaintiff did not avail herself of the protections of the sexual harassment policy at any point before she filed her complaint.  For these reasons, the Court will grant the motion for summary judgment as to the District on this issue and will deny plaintiff's cross-motion.

In summary, the Court will enter judgment in favor of Harllee Harper and the District on Count I, and will deny plaintiff's cross-motion.

## II.   __Count II__: Quid Pro Quo Harassment in Violation of DCHRA against Defendants the District and Fullilove

The District and Fullilove both move for summary judgment on plaintiff's quid pro quo harassment claim under the DCHRA, arguing that "[b]ecause Fullilove took no action against Waters despite his alleged veiled threats, Water's quid pro quo claims fail against both defendants."  Mot. at 40.  Plaintiff opposes defendants' motion, asserting that "there is evidence from which a reasonable jury could find quid pro quo sexual harassment."  Opp. at 42.

Quid pro quo harassment is defined as:

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature . . . when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment [or] (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual. . . .

29 C.F.R. § 1604.11(a) (EEOC's interpretation of Title VII).  *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65–66 (1986) (recognizing two forms of sexual harassment and adopting EEOC's interpretation of Title VII); District of Columbia, Office of Human Rights, Mayor's Order 2017-313, available at https://ohr.dc.gov/publication/dc-sexual-harassment-policy (adopting same definition of quid pro quo harassment); *see also Daka, Inc.*, 711 A.2d at 94 (noting that the D.C. Court of Appeals "consistently relies upon decisions of the federal courts in Title VII cases as particularly persuasive authority").  In other words, for there to be quid pro quo harassment, "a tangible job benefit or privilege [must be] conditioned on an employee's submission to sexual black-mail and [] adverse consequences follow from the employee's refusal."  *Gary v. Long*, 59 F.3d 1391, 1395 (D.C. Cir. 1995) (internal citation omitted).  An employer can be held

vicariously liable for quid pro quo harassment.  *See Faragher*, 524 U.S. at 807–08 (finding that "[a]n employer is subject to vicarious liability to a victimized employee . . . when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment").  However, if a plaintiff's sexual harassment claim "involves only unfulfilled threats, it should be categorized as a hostile work environment claim which requires a showing of severe or pervasive conduct," and not as a quid pro quo claim.  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753–54 (1998).

Plaintiff alleges that Fullilove threatened to deny her promotions to Grade 9, to take away her use of the union office, and otherwise demote her if she rebuffed his sexual advances.  *See* Pl.'s Answers to Interrog. at 7; Defs.' SOF ¶ 15; Pl.'s Resp. to Defs.' SOF ¶ 15.  Even if these allegations were undisputed, they would not be sufficient to support a quid pro quo claim.  Waters admits she never applied for a Grade 9 promotion.  Defs.' SOF ¶ 17; Pl.'s Resp. to Defs.' SOF ¶ 17.  Waters also admits Fullilove "did not end up taking away any of [the union office] privileges." Opp. at 41.  She states, though, that her transfer to New Beginnings is evidence of a tangible employment action that supports her quid pro quo claim.  *See* Opp. at 41.  Waters was indeed transferred to New Beginnings three days after she filed a sexual harassment complaint against Fullilove, *see* Defs.' SOF ¶ 23; Pl.'s Resp. to Defs.' SOF ¶¶ 23, 28; however, she has presented no evidence that Fullilove was involved in this transfer and no evidence that this transfer was a demotion or resulted in objectively tangible harm to her employment status.  Thus, while all of Fullilove's alleged conduct will be considered in connection with the hostile work environment in Count I, because he did not follow through on any of the alleged "threats," plaintiff has not come forward with evidence to support the quid pro quo claim in Count II.

The Court will grant the motions filed by the District and Fullilove for summary judgment on Count II.

III.   **Count III**: Retaliation in Violation of DCHRA against All Defendants

Waters alleges that all defendants subjected her to discipline in retaliation for her engaging in protected activity.  *See* Compl. ¶ 114.  The District, Fullilove, and Harllee Harper argue that none of the discipline was imposed *because* Waters engaged in protected activity, and they move for summary judgment in their favor on her retaliation claim under the DCHRA.  *See* Mot. at 25–33.  Plaintiff opposes this motion and also moves for summary judgment.  *See* Cross Mot. at 19, 33–34.

Separately, Moore argues that Waters has not made out a prima facie case of retaliation against him because he did not cause any adverse action to be taken against Waters in violation of the DCHRA.  *See* Moore's Mot. at 15–19.  Moore moves for judgment to be entered in his favor on that basis.[19]  *Id.* at 19–20.

Under the DCHRA, it is unlawful "to . . . retaliate against . . . any person . . . on account of having exercised or enjoyed . . . any right granted or protected under this chapter."  D.C. Code § 2–1402.61(a) (2001).  "To make out a prima facie case of retaliation, the plaintiff must establish: (1) she was engaged in a protected activity, or that she opposed practices made unlawful by the DCHRA; (2) the employer took an adverse personnel action against her; and (3) a causal connection existed between the two."  *Howard University v. Green*, 652 A.2d 41, 45 (D.C. 1994); *see also Carney v. Am. Univ.*, 151 F.3d 1090, 1095 (D.C. Cir. 1998), citing *Green*, 652 A.2d at 45 ("standard for retaliation claims under DCHRA mirrors standard under Title VII"); *Jones v.*

---

19   The Court concludes from the pleading that Moore moved for summary judgment on this count.

26

*Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009); *see Taylor v. Solis*, 571 F.3d 1313, 1320 n. * (D.C. Cir. 2009).

An "adverse action" in the context of a retaliation claim is one that is "harmful to the point that [such action] could well dissuade a reasonable worker from making or supporting a charge of discrimination," *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006), quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006), and it is highly dependent on the "particular circumstances" of plaintiff's employment. *Burlington N.*, 548 U.S. at 69. The D.C. Circuit has noted that an actionable event is one that would "affect the employee's 'position, grade level, salary, or promotion opportunities.'" *Solis*, 571 F.3d at 1321, quoting *Baloch*, 550 F.3d at 1199.

If a plaintiff cannot make a showing of material adversity, the inquiry ends there. *Chambers v. District of Columbia*, 389 F. Supp. 3d 77, 92 (D.D.C. 2019), *aff'd Chambers v. District of Columbia*, 988 F.3d 497 (D.C. Cir. 2021) ("[A]t the summary judgment stage, [plaintiff] must still, at a minimum, demonstrate that she suffered an adverse employment action."), citing *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008).

Otherwise, retaliation claims are to be evaluated in accordance with *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 792 (1973). *See Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). Under the *McDonnell Douglas* framework, a plaintiff bears the burden of making a prima facie showing of retaliation. *Id.* Once that showing has been made, the burden shifts to the defendant to produce a "legitimate, nondiscriminatory reason" for its actions. *Id.* (internal quotation marks omitted). If the employer makes this showing, then "the burden-shifting framework disappears," *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004),

and the question before the court is "whether a reasonable jury could infer . . . retaliation from all the evidence." *Id.*

At the summary judgment stage, however, if the employer produces a legitimate nondiscriminatory reason for its actions, "'the district court need not – *and should not* – decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas.*'" *Jones*, 557 F.3d at 678, quoting *Brady*, 520 F.3d at 494 (emphasis in original). The central question becomes whether the plaintiff produced evidence sufficient for a reasonable jury to find that the employer's stated reason for the adverse action was not the actual reason and that the employer actually retaliated against the plaintiff for engaging in protected activities. *See Brady*, 520 F.3d at 495. In answering this question, though, "the strength of the plaintiff's prima facie case, especially the existence of a causal connection, can be a significant factor" in showing a material dispute regarding retaliation. *Holmes-Martin v. Sebelius*, 693 F. Supp. 2d 141, 152 (D.D.C. 2010), citing *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 n.4 (D.C. Cir. 1998).

    a.  *Sexual Harassment:*

        i.  *February 21, 2017 Statement by Harllee Harper*

Waters alleges that "Harllee-Harper's February 21, 2017 statement in roll call that she had [']mixed feelings' about the investigation of Waters' sexual harassment complaint" is a retaliatory action. Compl. ¶ 114. Although Harllee Harper disputes whether she made this statement, *see* Ex. H to Mot., Defs.' Excerpts of Linda Harllee Harper's Dep. (Apr. 18, 2019) at 65:9–66:16, even if she did, it would not amount to an "adverse personnel action" against Waters. *See Green*, 652 A.2d at 45.

As part of the prima facie showing, plaintiff must establish that her employer "took an adverse personnel action against her." *Green*, 652 A.2d at 45. This means plaintiff must show

that "a reasonable employee would have found the challenged action materially adverse [and that it] might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68 (internal citation and quotation marks omitted). Plaintiff has not pointed to facts that would enable a reasonable juror to conclude that this alleged comment amounts to an adverse personnel action that would have dissuaded Waters from reporting Fullilove's behavior. Therefore, defendants' motion on this issue will be granted, and plaintiff's will be denied.

ii. *DCHR Investigation and Resulting Suspension from August 14, 2017 to August 16, 2017*

Waters claims that the 3-day suspension for, as she puts it, "spending time in Fullilove's office while he sexually harassed her" was retaliatory. Compl. ¶ 114. The District responds that there were "legitimate business reasons for its employment decision to discipline Waters," pointing to the DCHR investigation and report. Mot. at 32–33. Defendants also note that Fullilove and Harllee Harper were not involved in the decision to suspend Waters. *Id.*

The Court finds that the District has proffered a legitimate, non-retaliatory reason for its decision to suspend Waters for three days. The plaintiff, in turn, has not produced evidence sufficient for a reasonable jury to find that those reasons were merely pretextual. The evidence shows that DCHR conducted an independent investigation into Waters's sexual harassment allegations and concluded:

- Waters and Fullilove engaged in a "consensual relationship while both employees were on duty and on DYRS premises." DCHR Report at 8.

- Waters neglected her work duties by meeting with Fullilove, often for hours at a time and on multiple days a week, to discuss personal matters. *Id.* at 7.

- Waters sent Fullilove inappropriate messages that could be construed as "sexually suggestive." *Id.*

- Waters "participated in a close, personal, and inappropriate relationship with [] Fullilove while in the workplace compromising her dual role as a DYRS employee and union Vice-President." *Id.* at 8.

Based on these findings and DCHR's recommendation, Waters was suspended from her position from August 14 to August 16, 2017.  Ex. S to Mot. at 2.  Although Waters refers to DCHR's investigation as a "sham," Compl. ¶¶ 54, 57, 114, she has offered no evidence to show that the reliance on DCHR's findings was merely a pretext for retaliation; indeed, DYRS chose to impose a more lenient sanction than the one DCHR recommended, and it suspended Fullilove as well. [20] *See* DCHR Report at 8; Ex. S to Mot. at 1; Defs.' SOF ¶ 40; Pl.'s Resp. to Defs.' SOF ¶ 40.

For these reasons, defendants' motion on this issue will be granted, and plaintiff's will be denied.

### iii.  *August 17, 2017 Assignment to New Facility*

Waters did not allege in any complaint, including in the third iteration, that the assignment to the New Beginnings facility was a retaliatory action.  *See* Compl. ¶¶ 114, 135.  Similarly, her answers to interrogatories aver that the retaliation began within days of the transfer, but she did not state that the transfer itself was in retaliation for protected activity.  Pl.'s Answers to Interrog. at 7.  In their motion for summary judgment, defendants state that "no liability [could] be imposed for [the August 17, 2017] transfer[21] under either the DCHRA or [section] 1983 because a transfer

---

20      DCHR recommended that DYRS suspend Waters for eight days, but DYRS suspended her for three days only.  DCHR Report at 8; Ex. S to Mot. at 1.

21      Both plaintiff and defendants write that this transfer was a "reassign[ment] to [the] New Beginnings [facility], effective August 28, 2017."  Mot. at 29; Pl.'s Opp. at 23.  This cannot be. Waters was *already* assigned to New Beginnings as of February 5, 2017.  *See* Pl.'s Resp. to Defs.' SOF ¶ 28; *see also* Pl.'s Answers to Interrog. at 7.  And in fact, Waters elsewhere stated that "[a]round the end of August 2017, [she] received notice that [she] was being re-assigned from New Beginnings to DYRS's community location, the Achievement Center in SE Washington, DC."  Pl.'s Answers to Interrog. at 8.

to another work site, without more, does not rise to the level of an adverse action."  Mot. at 29, citing *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999).  In response, plaintiff argued for the first time that her reassignment was adverse because she "sat at a post and had nothing to do during her shift," citing a comment in her own deposition.  Opp. at 23, citing Ex. 12 to Opp., Pl.'s Excerpts of Pl.'s Dep. (Feb. 26, 2020) [Dkt. # 56-12] at 50:15–51:12.[22]  But during the deposition, plaintiff was not addressing whether the transfer had caused a material change in the conditions of her employment; she was asked whether she visited defendant Moore's office, and she replied, "I would go talk to him from time to time because they had me just sitting on a post, just sitting there. There was nothing to do."  Ex. 12 to Opp., Pl.'s Excerpts of Pl.'s Dep. (Feb. 26, 2020) at 51:9–51:12.

Since plaintiff never put defendants on notice that the transfer was an adverse event included in the retaliation claim so that they could explore it in discovery, and given the paucity of evidence on this point even if one accepts plaintiff's own account, the 2017 transfer that was implemented to separate her from Fullilove after she complained about him cannot serve as a

---

Plaintiff appears to confuse the facts in her response to defendants' motion for summary judgment. She argues that her August 17, 2017 reassignment to New Beginnings (which did not occur) was retaliatory because she had nothing to do at this location.  *See* Opp. at 23.  She does not make any such allegations about the Achievement Center, where she was apparently transferred in August 2017.

22      In this circuit, even where a reasonable jury could find that a new assignment "was generally less favorable than other assignments," the court has held that there was no adverse action involved for purposes of a retaliation action under Title VII where "there was no 'material' change in 'the terms, conditions, or privileges of her employment.'" *Jones v. D.C. Dep't of Corr.*, 429 F.3d 276, 281 (D.C. Cir. 2005), citing *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999). A reassignment with purely subjective harms, such as dissatisfaction or loss of reputation, is also generally not considered to be actionable; however, a transfer resulting in significantly different responsibilities or a significant change in benefits can be an adverse action that may form the basis for a retaliation claim.  *See Forkkio v. Tanoue*, 131 F. Supp. 2d 36, 44–45 (D.D.C. 2001), aff'd sub nom. *Forkkio v. Powell*, 306 F.3d 1127 (D.C. Cir. 2002).

predicate for a retaliation claim under either statute.  The Court will grant summary judgment in favor of defendants on this issue and deny plaintiff's cross-motion.

iv.  <em>Fullilove's Continued "Intimidation"</em>

In response to plaintiff's complaints about Fullilove's advances, DYRS transferred her out of his direct supervision.  Defs.' SOF ¶ 28; Pl.'s Resp. to Defs.' SOF ¶ 28; *see also* Pl.'s Answers to Interrog. at 7.  Waters alleged, though, that defendants subjected her to retaliation because they "[kept] her under Fullilove's supervision" and Fullilove continued to "intimidat[e] her with his presence and looks."  Compl. ¶ 114.  Defendants seek judgment on this claim on the grounds that plaintiff has not proved an adverse employment action: "Fullilove was Waters' fourth-line supervisor;" "[t]here is no evidence that Fullilove reviewed Waters' work, evaluated her performance, wrote her up for discipline, or disciplined her."  Mot. at 30.  Further, they argue that "[e]ven if Waters felt intimidated by Fullilove's presence and looks, none of these acts caused Waters to suffer any tangible employment loss."  *Id.*

Plaintiff must show that a reasonable employee would have found the challenged action to be materially adverse, and that it might have dissuaded a reasonable worker from making or supporting a charge of discrimination.  *See Burlington N.*, 548 U.S. at 68.  Plaintiff's claims do not rise to that level.  The parties agree that Waters and Fullilove were separated and worked at different facilities.  While Waters may have felt subjectively uncomfortable when Fullilove saw her, there is no evidence that these brief interactions were objectively harmful and affected plaintiff's working conditions.  Since plaintiff has not shown the adversity necessary to support a prima facie claim, she cannot sustain a retaliation claim based on the limited continued interactions with Fullilove, and, as relates to Fullilove's continued "intimidation," the Court will grant defendants' motion for summary judgment, and deny plaintiff's cross-motion.

32

b. *Car Incident:*

i. *February 24, 2017 "Advance Written Notice of Proposed Suspension" for Ten Days*

Waters also cites her "proposed 10-day suspension for alleged false statements" as a retaliatory action. Compl. ¶ 114. The suspension was proposed – but never imposed – after Waters filed a complaint with DYRS alleging that a DYRS program assistant attempted to hit her with a moving car in the agency parking lot. *See* Ex. Q to Mot.; Ex. 5 to Opp., Staff Incident Identification Form; Defs.' SOF ¶ 76; Pl.'s Resp. to Defs.' SOF ¶ 76; Ex. C to Mot. at 105:20–110:16.

Defendants move for judgment on this claim, arguing: (1) the report about the car incident was lodged and investigated before Waters filed her sexual harassment complaints against Fullilove; (2) the record does not show that Fullilove played a role in the investigation or in the discipline imposed; (3) the proposed suspension was based on DYRS's investigation of the incident; and (4) the suspension was rescinded, so it does not qualify as an adverse action. Mot. at 27–28.

Given that the suspension was never imposed, the Court finds that there is no "adverse action" underlying plaintiff's retaliation claim. *See Baloch*, 550 F.3d at 1199 ("[C]ourts have been unwilling to find adverse actions where the suspension is not actually served" and here, the proposed suspension "had no actual effects"), citing *Whittaker v. N. Ill. University*, 424 F.3d 640, 647 (7th Cir. 2005) ("[A] suspension without pay that is never served does not constitute an adverse employment action.") and *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 588 n.15 (11th Cir. 2000); *see also Hayes v. Chao*, 541 F. Supp. 2d 387, 394 (D.D.C. 2008) ("[T]he D.C. Circuit has repeatedly held that threats of future adverse actions are not tangible harms that may constitute adverse actions."), citing *Forkkio*, 306 F.3d at 1131; *Lutkewitte v. Gonzales*, 436 F.3d 248, 271 (D.C. Cir. 2006) (Brown, J., concurring) ("Threats of

future adverse actions . . . may culminate in a tangible employment action if carried out, but they do not themselves meet the standard."). The Court will grant defendants' motion for summary judgment on this issue, and deny plaintiff's cross-motion.

ii. *April 6, 2017 Official Reprimand*

The proposed suspension for the false report concerning the car incident was reduced to an official reprimand. Ex. Q to Mot. Waters argues that the official reprimand was "still 'materially adverse'" and therefore actionable. Opp. at 21.[23]

Defendants have supplied a non-retaliatory reason for the action: DYRS issued Waters an official reprimand because, after reviewing video footage of the car in the parking lot, it determined she filed an inaccurate incident report. Defs.' SOF ¶¶ 78, 80; Pl.'s Resp. to Defs.' SOF ¶¶ 78, 80. Waters argues that any punishment for her involvement in the incident was unwarranted, and she maintains she was truthful when she reported that a DYRS employee tried to hit her with a car. *See* Opp. at 19–21. But the question at this stage is not what happened on that occasion. Plaintiff has identified no facts to show that the agency's explanation – that it made a decision based upon its review of video of the parking lot – was merely a pretext for retaliation, and therefore, defendants' motion on this issue will be granted, and plaintiff's will be denied.

c. *Inappropriate Comments:*

i. *August 25, 2017 to October 29, 2017 Administrative Leave*

Waters also claims that DYRS placed her on paid administrative leave between August 25 to October 29, 2017 to retaliate against her for her protected activities. Compl. ¶ 114; *see also* Opp. at 26–27 (arguing this was materially adverse because "after she filed her sexual harassment

---

23    Defendants do not appear to address whether the official reprimand was a retaliatory action, noting generally that "after Waters grieved the recommended suspension for filing a false statement, the suspension was rescinded . . . Thus, Waters suffered no adverse action." Mot. at 28.

complaint[,] she suddenly became the target of these employment actions," she was "humiliated and embarrassed as it appeared to her co-workers that she was going to be fired, and she was banned from her worksite").[24]

Defendants explain that they placed Waters on paid administrative leave while they investigated inappropriate comments she allegedly made. *See* Ex. 6 to Opp.; *see also* Ex. 8 to Opp., Letter from Krista Scalise to Kim Waters (Oct. 12, 2017) (SEALED). They contend that the circumstances do not allege an actionable adverse employment action for purposes of either the DCHRA or section 1983 because "Waters lost no income nor did she suffer any tangible employment losses when she was placed on administrative leave with pay, rather than without pay." Mot. at 31.

Other courts in this district have found that placement on paid administrative leave, particularly if only for a brief period of time, does not constitute an adverse personnel action for purposes of a retaliation claim. *Roberson v. Snow*, 404 F. Supp. 2d 79, 93 (D.D.C. 2005) (citing cases for proposition that placement on administrative leave is generally not an adverse employment action that violates Title VII's antiretaliation provision, but not deciding the issue); *Boykin v. England*, No. CIV.A. 02-950 (JDB), 2003 WL 21788953, at *4 n.5 (D.D.C. July 16, 2003) (evaluating whether employer's actions were discriminatory or retaliatory, saying, "If the Navy had placed plaintiff on administrative leave . . . the Court would have jurisdiction to

---

24      Waters submitted a declaration on April 9, 2021, in which she added that the Superintendent of New Beginnings handed her the letter concerning the leave, asked her to collect her personal items, and escorted her out of the building. Ex. 1 to Pl.'s Reply to Opp. to Cross Mot. for Summ. J. [Dkt. #67-1]. All defendants have moved to strike this declaration as a "sham," stating that it is "rife with hearsay and speculation, and contradicts Waters' prior deposition testimony." Mot. to Strike at 1. The Court will deny defendants' motion to strike as moot since even if the new statements were considered, they would not alter the Court's analysis of her retaliation claims.

review plaintiff's allegations.  But plaintiff's claim would still fail, as case law suggests that an employee's placement on paid administrative leave for a limited period does not constitute an adverse employment action.").

Here, plaintiff was on paid administrative leave for 66 days.  This may have been of sufficient duration to qualify as an action that could dissuade an employee from bringing a complaint, but since plaintiff lost no pay or benefits, it is questionable whether the evidence creates a genuine issue for the jury on whether a reasonable employee would find the assignment to be materially adverse.  But like the other courts above, this Court will leave that issue for another day since plaintiff has not come forward with any evidence that would show that the reason offered for the leave – the pendency of an ongoing investigation – was merely pretextual.

Further, plaintiff has not offered any evidence that would show that a causal connection existed between her sexual harassment claim and the placement on paid administrative leave.  Although plaintiff may establish "[t]he causal connection component of the prima facie case . . . by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity[,]" *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985), the temporal proximity must be "very close."  *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (approvingly citing cases where three- and four-month internals were insufficient to infer causality); *Hamilton v. Geithner*, 666 F.3d 1344, 1357–58 (D.C. Cir. 2012) (recognizing that in *Breeden*, "the Supreme Court . . . cited circuit decisions suggesting that in some instances a three-month period between the protected activity and the adverse employment action may, standing alone, be too lengthy to raise an inference of causation," but also stating that "neither the Supreme Court nor this court has established a bright-line three-month rule"); *see also McIntyre v. Peters*, 460 F. Supp. 2d 125, 133 (D.D.C. 2006) (citing cases showing

that courts in this district often follow a three-month rule to establish causation on the basis of temporal proximity).  Here, Waters was placed on paid administrative leave on August 25, 2017 – nearly seven months after she filed her sexual harassment claim.  Ex. 6 to Opp.; Defs.' SOF ¶ 23; Pl.'s Resp. to Defs.' SOF ¶ 23.

For these reasons, defendants' motion for summary judgment on this issue will be granted and plaintiff's will be denied.

    ii.   *October 12, 2017 "Advance Written Notice of Proposed Suspension of Ten (10) Days"*

Waters alleged that the "October [12], 2017 notice of proposed suspension for 10 days" was yet another instance of defendants' retaliation against her for reporting Fullilove's sexual harassment.  Compl. ¶ 114.  Defendants move for summary judgment on the grounds that there was no adverse action: the suspension was proposed but not imposed.  Mot. at 28–29; *see also* Defs.' Reply at 6.  They also contend that the causation element of a retaliation claim has not been established given the lack of temporal proximity: the notice was issued eight months after plaintiff filed her OHR complaint.  Fullilove and Harllee Harper agree that with respect to individual liability, there are no facts showing they were involved.

Because the suspension was proposed, and never actually imposed, Waters has not come forward with facts to show that defendants took an adverse personnel action against her in this instance, *see Baloch*, 550 F.3d at 1199, and therefore defendants' motion for summary judgment on this issue will be granted and plaintiff's will be denied.

    d.  *Marijuana Use:*

    i.  *June 21, 2019 Placement on Administrative Leave*

Waters claims that defendants retaliated against her by "proposing her termination for a positive urine test, placing her on [paid] administrative leave, and ultimately terminating her

37

employment as of August 9, 2019."  Compl. ¶ 114; *see* Ex. 16 to Pl.'s Opp.  Defendants argue that not only were Fullilove and Harllee Harper not involved in this process, but the District's actions were nonetheless justified because "the [medical] marijuana card Waters had on file had expired by the date of her testing . . . ."  Mot. at 33.  Waters counters that defendants did not have a legitimate, non-retaliatory reason for placing her on administrative leave – and later, for terminating her – given that she lawfully participated in Maryland's medical marijuana program and that District policy permitted her to use marijuana for medical purposes.  Opp. at 31–32.

The Court finds that it is a close question whether being placed on administrative leave for 49 days in June of 2019 was a materially adverse employment action; the amount of time was longer than the short periods that courts have found would fail to qualify, but it is also the case that plaintiff has not pointed to the loss of any pay or benefits.  But even if one were to find the action to be adverse, the claim fails because Waters has not offered any evidence to call defendants' stated reasoning into question, or to show there was a causal connection or temporal proximity between the filing of the sexual harassment claim on February 3, 2017 – or even the filing of this lawsuit on October 3, 2017 – and the administrative leave imposed over two years later.  Therefore, defendants' motion on this issue will be granted, and plaintiff's will be denied.  The termination is a different matter.

ii.  *August 9, 2019 Termination*

Waters also attributes the August 9, 2019 termination to retaliation.  Compl. ¶ 114.  Defendants came forward with a legitimate, nonretaliatory reason for the action, as Waters tested positive for marijuana after her medical marijuana card had expired.  Mot. at 33.

Waters certainly engaged in protected activity when she filed the sexual harassment claim in February 2017 and this lawsuit in October 2018.  *See* 42 U.S.C. § 2000e-3 ("It shall be an

unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing[.]").   And there is no question that she also "suffered an adverse employment action" when the District fired her.[25]  However, plaintiff has not pointed to evidence that could lead a reasonable juror to conclude that defendants' stated reason for terminating her was pretextual or retaliatory.

The District explained that it terminated Waters because her medical marijuana card was expired at the time she was randomly selected for drug testing and tested positive.  Defs.' SOF ¶¶ 52, 58–64; Pl.'s Resp. to Defs.' SOF ¶¶ 52, 58–64; *see* Termination Letter from Zimmerman.  It was DCHR, not DYRS, where Fullilove and Harllee Harper worked, that issued the decision terminating Waters.  *See* Termination Letter from Zimmerman.  Plaintiff makes conclusory assertions in her opposition, *see* Opp. at 33, but she does not point to evidence in the record that would give rise to a genuine dispute about the agency's actual motivation.  Moreover, Waters was terminated on August 9, 2019 – two and a half years after she filed her sexual harassment claim against Fullilove, and over ten months after she initiated this lawsuit.  Termination Letter from Zimmerman; Ex. 1 to Notice of Removal.  This means that there is no inference to be drawn based on chronology alone.  *See Breeden*, 532 U.S. at 273; *Hamilton*, 666 F.3d at 1357–58.

While one could raise questions about the manner in which this employment issue was handled, eventually the termination was successfully challenged and rescinded.  The Court takes no position on the wisdom of the initial decision; it simply finds that plaintiff has not supplied

---

25      The Court notes that Waters successfully contested her termination.  *See* Arbitration Op.

evidence to support a jury finding that the agency's stated reasons were pretextual and it was a retaliatory decision, and therefore defendants' motion for summary judgment on this issue will be granted and plaintiff's will be denied.

        e. *Intimidation of Other Employees*

Finally, Waters alleges that other employees were subjected to retaliation after she filed sexual harassment complaints against Fullilove, and she complains of: (1) the "termination of Waters' co-worker who corroborated incidents of Fullilove's sexual harassment of her"; (2) "Harllee-Harper's intimidation of senior staff who recommended Fullilove's termination"; and (3) the "orchestrated attempts to get co-worker(s) to file complaints to discipline her." Compl. ¶ 114.

Defendants submit in their motion that these allegations cannot support plaintiff's claim for retaliation and the Court should dispose of them at summary judgment. *See* Mot. at 26, 29–30; *see also* Defs.' Reply at 10 ("Waters['s] acknowledgment that discovery has not yielded support for these claims supports judgment on these claims in Defendants' favor.").

While defendants' motion does not address all of these claims in detail, it raises a fundamental jurisdictional issue. Rule 12 provides that a district court must dismiss a complaint when it is evident that it lacks subject-matter jurisdiction, *see* Fed. R. Civ. P. 12(h)(3), and it may do so *sua sponte*. *See Evans v. Suter*, No. 09-5242, 2010 WL 1632902, at *1 (D.C. Cir. Apr. 2, 2010). Federal courts have no subject-matter jurisdiction to decide the case if standing is lacking. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1361 (D.C. Cir. 2012).

The Supreme Court established in *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992), that constitutional standing consists of three elements: the plaintiff must have (1) suffered an injury in

fact; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is likely to be redressed by a favorable judicial decision. *Id.* at 560–61. To meet the first element, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1548, quoting *Lujan*, 504 U.S. at 560; *see also Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982), quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 (1979). "In response to a summary judgment motion . . . the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts . . . which for purposes of the summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561 (internal quotations and citations omitted).

As a general rule, a third party does not have standing to bring a claim asserting a violation of someone else's rights. *See Powers v. Ohio*, 499 U.S. 400, 410 (1991) ("In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties."). To establish standing despite this general rule, three prudential considerations are weighed: (1) "the litigant must have suffered an injury in fact," (2) "the litigant must have a close relation to the third party," and (3) "there must exist some hindrance to the third party's ability to protect his or her own interests." *Lepelletier v. FDIC*, 164 F.3d 37, 43 (D.C. Cir. 1999), quoting *Powers*, 499 U.S. at 411 (internal edits and quotation marks omitted). Plaintiff has not asserted there is anything hindering the unnamed co-worker who was allegedly terminated or the senior staff who she claims were intimidated, from protecting their own interests. Nor has she asserted that she had a "close relation" with any of them.

Further, plaintiff has not come forward with facts in the record to show that Harllee Harper or anyone else managed to bring about any adverse personnel action with the "attempts" to

encourage co-workers to file complaints against her.  Since these remaining, summary allegations do not provide a basis for the retaliation claim to go forward either, the Court will enter judgment in favor of defendants on Count III, and will deny plaintiff's motion on that count.

IV.    **Count IV**: **Section 1983 Claim Based on a Hostile Work Environment in violation of the Fifth Amendment against Defendants Fullilove and Harllee Harper**

In Count IV, plaintiff seeks damages from defendants Fullilove and Harllee Harper for their alleged "discriminatory treatment of [p]laintiff based on her gender . . . under the DCHRA, Title VII of the Civil Rights Act of 1964 . . . and the Due Process Clause of the Fifth Amendment to the United States Constitution, actionable under 42 U.S.C. § 1983."  Compl. ¶ 130.

Harllee Harper moved for summary judgment on the section 1983 count, arguing that "Waters cannot show that Harllee Harper deprived her of a constitutional right."  Mot. at 41. Fullilove did not join in the motion.  *See id.*  Plaintiff opposes Harllee Harper's motion, and cross-moves for summary judgment against Harllee Harper on this count.  *See* Cross Mot. at 42; Opp. at 42.

Section 1983 of the Civil Rights Act provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  To succeed in a section 1983 claim against a District official, plaintiff "must produce evidence 'that each [person], through [his or her] own individual actions, has violated the Constitution.'"  *Elkins v. District of Columbia*, 690 F.3d 554, 564 (D.C. Cir. 2012), quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

"The Due Process Clause, which is applicable to the District of Columbia, . . . 'contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups.'"  *Acosta v. Univ. of Dist. of Columbia.*, 528 F. Supp. 1215, 1224–25 (D.D.C. 1981), quoting *Washington v. Davis*, 426 U.S. 229, 239 (1976), and citing *Bolling v. Sharpe*, 347 U.S. 497 (1954).[26]  "The usual due process analysis . . . has been two-staged: identifying the existence of a constitutionally protected property or liberty interest and then assessing the appropriate measure of procedural protection due."  *Colm v. Vance*, 567 F.2d 1125, 1127–28 (D.C. Cir. 1977).  "The equal protection component of the Due Process Clause . . . confers on [plaintiff] a federal constitutional right to be free from gender discrimination . . . ."  *Davis v. Passman*, 442 U.S. 228, 235 (1979).

Harllee Harper argues that Waters has not established the predicate for a section 1983 claim against her: that she personally violated plaintiff's constitutional rights.  "Waters has failed to show that Harllee Harper aided and abetted Fullilove in sexually harassing [Waters], or that Harllee Harper violated her constitutional rights by not reporting Fullilove's alleged sexual harassment."  Mot. at 41.  Plaintiff has pointed to evidence in the record that "'during several meetings,' Harllee Harper observed Fullilove invade [Waters's] personal space, hug Waters, and engage in other inappropriate touching as Waters leaned away or tried to pull or get away from his presence."  Defs.' SOF ¶ 21, citing Pl.'s Answers to Interrog. at 7; Pl.'s Resp. to Defs.' SOF ¶ 21.  That is disputed, *see* Defs.' SOF ¶ 22; Pl.'s Resp. to Defs.' SOF ¶ 22, so it cannot support judgment in

---

26    In *Bolling v. Sharpe*, the Supreme Court found that although the Fifth Amendment does not on its face contain an equal protection clause, if "the Constitution prohibits the states from maintaining racially segregated public schools" under the Fourteenth Amendment's equal protection clause, "it would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government . . . . [R]acial segregation in the public schools of the District of Columbia is a denial of *the due process of law guaranteed by the Fifth Amendment to the Constitution*." 347 U.S. at 500 (emphasis added).

plaintiff's favor, but even if one assumes it to be true, it is not enough to defeat Harllee Harper's motion.  Plaintiff has not pointed to evidence of specific actions on Harllee Harper's part that contravened the constitution, or that abetted Fullilove's inappropriate advances.  Therefore, plaintiff has failed to come forward with evidence that would give rise to a viable section 1983 claim.  Accordingly, summary judgment will be granted in favor of Harllee Harper on Count IV.  Plaintiff's motion for summary judgment as to Harllee Harper will be denied, but her section 1983 claim against Fullilove stands.

V.   **Count V**: Retaliation in Violation of Section 1983 against Defendants Fullilove, Harllee Harper, and Moore

Plaintiff alleges that "[d]efendants' retaliatory treatment of [p]laintiff based on her protected activities constitutes a violation of her rights under the DCHRA, Title VII of the Civil Rights Act of 1964 . . . and the Due Process Clause of the Fifth Amendment to the United States Constitution,"  Compl. ¶ 140, and Count V seeks damages from individual defendants Fullilove, Harllee Harper, and Moore for the violation of her Fifth Amendment due process rights under section 1983.

a.  *Moore*

Moore has filed a motion for judgment on the pleadings in his favor, arguing that Waters has provided no facts to show that Moore retaliated against her for engaging in protected activity.  *See* Moore's Mot. at 16.  Moore has also moved for summary judgment on this count.  *Id.*

Waters alleges that Moore violated her constitutional rights under section 1983 because he knew Waters was enrolled in the Maryland medical marijuana program, Compl. ¶¶ 73, 76, *see also* Pl.'s SOF Pertaining to Moore ¶ 16, assured her that she would not be terminated from her position despite testing positive for marijuana, Compl. ¶ 78, but did not "share or otherwise clarify her

program participation with DCHR staff so that the proposed termination could be rescinded." Compl. ¶ 76.

Although the Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups, *see Acosta*, 528 F. Supp. at 1224–25, the D.C. Circuit has not addressed whether a retaliation claim is also cognizable under the due process clause for that reason. *See Harrison v. Fed. Bureau of Prisons*, 298 F. Supp. 3d 174, 181 (D.D.C. 2018).[27]

This Court need not address that question here.  Even if retaliation is prohibited by the due process clause, and it can be reached under section 1983, plaintiff has not pointed to any facts that would support a finding that Moore, through his individual actions, deprived her of a constitutional right.  Moore did not select Waters for drug testing or make the decision to terminate her.  Moore's SOF ¶ 6; Pl.'s Resp. to Moore's SOF ¶ 6; Termination Letter from Zimmerman.  Even if Moore was involved in the short-lived decision to terminate Waters in 2019, Waters has not pointed to any direct evidence linking his actions to her protected activities, and there is no temporal proximity to give rise to an inference of causation: the EEO action was filed on February 2, 2017, and the termination decision that was later rescinded was issued on August 1, 2019.

The Court will grant summary judgment in favor of Moore on the Fifth Amendment retaliation claims.

b.  *Fullilove and Harllee Harper*

---

27      The majority of circuit courts have held that the Fourteenth Amendment's equal protection clause "cannot sustain a pure claim of retaliation."  *Wilcox v. Lyons*, 970 F.3d 452, 461 (4th Cir. 2020), cert. denied, 141 S. Ct. 2754 (2021) (collecting cases from Third, Fifth, Sixth, Seventh, Tenth, and Eleventh Circuits holding the same).  The Second Circuit, though, has held that section 1983 includes retaliation claims because "retaliation is a form of discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 82 (2d Cir. 2015).

Fullilove and Harllee Harper have moved for summary judgment on Waters's section 1983 retaliation claim; plaintiff has cross-moved for summary judgment. *See* Mot. at 25–33; Cross Mot. at 19. Plaintiff, Fullilove, and Harllee Harper have relied on the same evidence and arguments considered above in connection with the DCHRA count. *See* Mot. at 25–33; Cross Mot. at 19.

Since the Court has already found that plaintiff could not show there is a genuine issue for trial based on any of the allegedly retaliatory actions, *see* Section III above, plaintiff has not shown that Fullilove or Harllee Harper deprived her of a federal right by retaliating against her. The Court will grant summary judgment in favor of Fullilove and Harllee Harper on the Fifth Amendment retaliation claims and deny plaintiff's cross-motion.

## VI.   Count VI: Retaliation in Violation of Title VII against Defendant the District

In Count VI, Waters alleged that "[b]ecause of [her] protected activities," the District "terminated her employment . . . for testing positive for the use of marijuana even though at the time she was enrolled and participating in the Maryland [m]edical [m]arijuana [p]rogram," and that this violated Title VII, as well as the DCHRA. Compl. ¶¶ 144–46. The District moved for summary judgment on plaintiff's retaliation claim, arguing that "Waters cannot meet her burden under Title VII because she cannot establish the necessary causal link." Mot. at 34. Further, the District argues it had a "legitimate business reason for its employment decision" to terminate Waters. *Id.* at 33. Plaintiff opposes the District's motion and moves for summary judgment in her favor. *See* Cross Mot. at 34–35.

As the Court has already found above, plaintiff has not come forward with evidence to defeat defendants' motion for summary judgment on the claims alleging that the August 2019 termination was retaliatory. Since the standard is the same for the DCHRA and Title VII, *see*

*Green*, 652 A.2d at 45, the Court will grant the District's motion for summary judgment on Count VI and deny plaintiff's cross-motion on Count VI.

## CONCLUSION

For these reasons, the motion for summary judgment filed by the District, Fullilove, and Harllee Harper [Dkt. # 50] will be **GRANTED**.  While the hostile work environment claims against Fullilove (Counts I and IV) will move forward, the Court will enter judgment in favor of the District on Counts I, II, III, and VI; in favor of Fullilove on Counts II, III, and V; and in favor of Harllee Harper on Counts I, III, IV, and V.  Plaintiff's cross-motion for summary judgment [Dkt. # 60] on Counts I, III, IV, V, and VI will be **DENIED**.

The motion filed by Moore [Dkt. # 51] will also be **GRANTED**, and the Court will enter judgment in favor of Moore on Counts III and V.

The motion to strike plaintiff's declaration filed by the District, Fullilove, Harllee Harper, and Moore [Dkt. # 68] will be **DENIED AS MOOT**.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: March 10, 2022